Anthony **CAMPOREALE**, Plaintiff,

v.

**AIRBORNE FREIGHT CORP.**, and Local Union 295, International Brotherhood of Teamsters, Defendants.

No. CV 86–3669 (ADS).

United States District Court, E.D. New York.

March 13, 1990.

---

Kipp Elliott Watson, New York City, for plaintiff Anthony Camporeale.

Morgan, Lewis & Bockius, New York City, for defendant Airborne Freight Corp.; Andrew J. Schaffran, Bruce J. Douglas, of counsel.

Law Office of Ira Drogin, New York City, for defendant Local Union 295, Intern. Broth. of Teamsters; Stephen H. Gelb, of counsel.

SPATT, District Judge.

In this case the Court is asked to determine whether, as a matter of law, an employer's discharge and a union's processing of a grievance and its decision not to pursue formal arbitration on behalf of a union member, breaches the terms of a collective bargaining agreement, and/or violates the provisions of the Federal Labor–Management Relations Act ("LMRA"), (29 U.S.C. § 185), the Labor–Management Reporting and Disclosure Act ("LMRDA"), (29 U.S.C. § 411[a][5]), and the New York State Human Rights Law ("HRL"), (N.Y.Exec.Law §§ 290–301 [McKinney's 1982 & Supp. 1989]), when the discharge is based upon a claim of excessive absenteeism. After searching the record, reviewing the evidence presented and determining that there are no genuine material issues of fact, this Court holds that under these circumstances, neither the union nor the employer violated either the agreement or applicable law.

## I. FACTUAL BACKGROUND

Defendant Airborne Freight Corporation ("Airborne"), is engaged in the "air express" business, which, in essence, provides courier services to businesses throughout the country and overseas. A significant portion of Airborne's business involves the shipment or transmittal of letters or packages for "express" overnight delivery, which has become central to the conduct of American business practice in recent years.

Due to the highly competitive nature of this business, customers of Airborne, as well as of other overnight couriers, are apt to switch to a competitor, rather than tolerate frequent, or even occasional unreliability. In order to successfully meet its service commitments, Airborne maintains a large fleet of aircraft and trucks, and, concomitantly, is necessarily dependent upon employees in all phases of the process who must be consistently dependable. One such employee is the delivery truck driver.

In the New York City metropolitan area, Airborne's delivery truck drivers are required to report for their shift at 7:00 a.m. each workday. Upon the arrival of loaded aircraft at JFK International Airport in Queens, New York ("JFK"), cargo is unloaded, sorted in accordance with each truck driver's assigned delivery area, and then delivered.

Airborne is a party to several collective bargaining agreements, whereby labor unions represent various nonsupervisory employees. Its truck drivers, for example, are represented by the defendant Local Union 295, International Brotherhood of Teamsters, Chauffeurs, Warehouseman and Helpers of America ("Local 295"), as evidenced by a series of agreements entered into between Airborne and Local 295. Plaintiff, Anthony Camporeale ("Camporeale"), became employed by Airborne in early 1978 as a truck driver, and, accordingly, was represented by Local 295 to the time that his employment was terminated on May 2, 1986. The particular agreement which is the basis of this dispute covered the period September 1, 1985 through August 31, 1988 ("Agreement").

Section 21 of the Agreement, as amended, governs the grievance and arbitration procedures to be followed by Local 295 and Airborne in the event a dispute arises between them. According to the relevant provision of section 21, once a dispute or grievance arises between the "parties" (*i.e.*, Airborne and Local 295), it "shall" be settled under the three-step process set forth in the Agreement, as follows:

"Step 1: Between the aggrieved employee, Steward and Foreman of the department involved. If not settled within five (5) working days, then

Step 2: Between a business representative of the Union or other person designated by the Union and the plant superintendent or other company designee. If not settled within five (5) working days, then

Step 3: The dispute shall be submitted to a Joint Grievance Settlement Board (herein called the "Board") pursuant to the Local 295 Joint Settlement Board Agreement." (Agreement § 21.)

Section 21 also provides that "[n]o employee shall be involuntarily removed from the job for disciplinary reasons prior to either agreement of the parties or an arbitration ruling unless [Airborne] has cause to charge the employee with a serious offense," such as, for example, drunkenness, dishonesty, theft or unprovoked assault. In addition, Airborne "may establish such company rules as it deems necessary or desirable, provided such rules are not in conflict with [the] Agreement," and Airborne has the written approval of Local 295. (Agreement § 24.)

Throughout the early 1980's, Airborne was faced with the rising problem of excessive absenteeism, particularly among the delivery truck drivers, including Camporeale. From 1980 through 1986, Camporeale was sporadically and erratically absent from work, with a noticeably higher absentee record than many of his co-workers. His absences usually consisted of calling in sick immediately (sometimes just minutes) before the beginning of his scheduled shift, which absence would sometimes last for a few days or more. On occasion, he would

even "bid" for overtime work, then call in sick.

However, Camporeale was not the only employee who had an excessive absentee record. Some of the employees with high absentee rates were, unfortunately, suffering from serious ailments which rendered them unable to work for extended periods. Others requested and sometimes received Airborne's consent for extended absences for a variety of personal reasons. Still others had an unexplained absentee record like Camporeale. Airborne's response to this type of situation usually consisted of written or oral notifications to the employee. In addition, some "Step 2" hearings were had with some of the employees, including Camporeale. Finally, due to the serious operational and customer relation problems that Airborne alleged it was experiencing from the excessive absenteeism, in January of 1985, under the direction of Gary Chardavoyne, the new Domestic Operations Manager at JFK [1], Airborne instituted a new "get tough" policy on absenteeism. After conferring with Airborne supervisors and Local 295 Shop Stewards, Chardavoyne issued a memorandum on February 7, 1985 to all JFK supervisors ("February 7 Memo").[2]

Chardavoyne also instituted mandatory monthly meetings for all employees at JFK, at which the importance of the new "get tough" absenteeism policy was stressed and discussed. In July of 1985, Chardavoyne directed his managers, supervisors and shop stewards to maintain and periodically review absentee calendars for each of the employees over whom they had responsibility.

In accordance with the new policy, Mark Allen, Camporeale's immediate supervisor, brought to Chardavoyne's attention the fact that Camporeale had continued to be excessively absent in the early part of 1985. Allen issued several written and oral warnings to Camporeale regarding his absenteeism. Camporeale countered with a variety of medical reasons for his absences—ranging from "upset stomach" and "sinus condition" to "depression"—for which he generally proffered doctor's notes to Allen. By the close of 1985, Camporeale had accumulated 24 absences in that year—most of which consisted of several consecutive days at a time, which frequently immediately preceded or followed weekends.

In January of 1986, in accordance with Step 1, Allen provided Camporeale with a "final warning" that disciplinary action would be taken as a result of Camporeale's excessive absences in 1985. Thereafter, during the period from February, 1986 through April, 1986, Camporeale called in sick nine additional days, each absence beginning on a Monday, and sometimes lasting for several days. Finally, on April 30, 1986, Chardavoyne prepared a memorandum advising Camporeale that his unsatisfactory attendance record has compelled Airborne to seek disciplinary action. Chardavoyne requested Allen to deliver this memorandum to Camporeale when he reported to work at his next scheduled workday, May 1, 1986. This Allen could not do, only because Camporeale again failed to report to work as scheduled. Allen did finally deliver the memorandum to Camporeale at the start of his shift on May 2, 1986. He also advised Camporeale that a Step 2 hearing was scheduled for that afternoon.

On the afternoon of the 2nd of May, Camporeale attended his Step 2 hearing,

---

1. Chardavoyne formerly worked in a supervisory capacity at Airborne's facility in Chicago, Illinois.

2. In relevant part, the February 7 Memo states: "We will adhere to the three step progressive disciplinary system. Step 1, Warning Letter—issued in the presence of the Shop Steward; Step 2, Final Warning Letter—issued in the presence of the Shop Steward; Step 3, Arbitration, with possible disciplinary action. It was agreed upon that acceptable attendance would not exceed one (1) occurrence per month (sick days) and/or three (3) tardiness' per month. Any employee that calls off sick for three (3) consecutive days (or more) will be required to bring a Doctor's note to return to work. Employees calling in sick are required to speak directly to a Supervisor. If the Supervisor is not present in the building, the employee should either call back or leave a number where they can be reached by the Supervisor."

which lasted approximately one hour, and was attended by the District Operations Manager of Airborne, the Secretary/Treasurer of Local 295, the Shop Steward for Local 295, the Shop Steward for Local Union 851[3], Chardavoyne and Camporeale. At the hearing, following the usual procedure, Airborne presented its side of the story, followed by Camporeale's version. Like all other employees involved in a Step 2 proceeding, Camporeale was then excused from the hearing to allow Airborne and Local 295 to deliberate. During deliberation, Camporeale's personnel file and absentee calendars for 1984, 1985 and 1986 were perused and discussed by both Airborne and Local 295. The representative for Local 295 inquired as to whether or not Airborne was firm on the dismissal of Camporeale. Since it was, Local 295 suggested that perhaps Airborne would accept Camporeale's resignation and provide him with a "suitable" reference, rather than discharge him. Airborne agreed this would satisfactorily resolve the matter, and recalled Camporeale into the hearing.

Upon being recalled into the hearing, the representative of Local 295 advised Camporeale of Airborne's decision to terminate his employment, and that, in light of his excessive absenteeism, coupled with the numerous prior oral and written warnings issued and the unsuccessful arbitration of another employee discharged for excessive absences[4], Local 295 could not expect to mount a successful arbitration challenge to Airborne's decision. Camporeale was offered the option to resign with a suitable reference, which he declined. Rather, he pled for reinstatement, promising to improve his acknowledged poor attendance record.

Camporeale thereafter instituted this action alleging that Local 295 breached its duty of fair representation and that Airborne's termination constituted unjust discharge, both in violation of the LMRA. In addition, Camporeale claims that both defendants engaged in retaliatory discharge in violation of the LMRDA, and discriminatory practices on the basis of disability in violation of the state HRL. Specifically, Camporeale alleged that the true reason for his discharge was either: (1) in retaliation to Camporeale's filing of two petitions with the defendants in March, 1986 and May, 1985[5]; or, (2) because of discrimination based upon a "disability."

## II. PROCEDURAL SETTING

Camporeale's complaint initially alleged three causes of action against Airborne: (1) unjust discharge in violation of the LMRA; (2) retaliatory discharge in violation of the LMRDA; and, (3) discrimination on the basis of a disability in violation of the state HRL. It also alleged three causes of action against Local 295, namely: (1) breach

3. The Shop Steward for Local Union 851 was present because, as was customary, several Step 2 hearings for employees represented by *both* unions were usually scheduled for the same day.

4. In December of 1983, Airborne sought to terminate the employment of Joseph Lerro, Jr., based on excessive absences. Local 295 pursued formal arbitration on behalf of Lerro, which resulted in the reduction from termination to suspension. Thereafter, Lerro's attendance record failed to improve, and he was again terminated. At the second arbitration hearing in August of 1984, Arbitrator Stanley L. Aiges upheld his dismissal, noting that:

"Needless to say, every employee is vulnerable to the possibility of sickness or an accident. Absences resulting from legitimate illnesses or disabilities ordinarily would not be held to justify discipline or discharge. Nevertheless, some limits may properly be placed upon the extent to which an individual may retain rights to his job in the face of a long history of excessive absenteeism. That is true even if *all* of the absences are entirely innocent and legitimate.

\* \* \* \* \* \*

In such a case, even a bona fide illness could not forever serve to excuse all absences."
*Matter of the Arbitration Between Airborne Freight Corp. and Local 295, I.B.T. (In re Lerro),* at 8 (Sept. 3, 1984) (Aiges, Arb.).

5. During the course of his employ with Airborne since 1978, Camporeale filed two petitions with Local 295: one in 1985 regarding bidding for vacation slots, and a second in 1986 based on a payroll deduction to support striking union members. As to the earlier petition, approximately 75% of the Local 295 membership signed it (*see* Camporeale Affidavit ¶ 14), and as to the latter one, over 100 employees at JFK signed it. (*See* Hallahan Affidavit ¶ 27, Exhibit "D.")

of the duty of fair representation in violation of the LMRA; (2) retaliatory discharge in violation of the LMRDA; and, (3) discrimination on the basis of a disability in violation of the state HRL.

On July 2, 1987, the Honorable Charles P. Sifton of this Court granted Airborne's motion to dismiss the second cause of action alleging retaliatory discharge, on the basis that it was preempted by the National Labor Relations Act.[6] On October 10, 1989, Judge Sifton granted Local 295's motion to dismiss the cause of action alleging retaliatory discharge, but granted Camporeale leave to amend the complaint. Camporeale has since served an amended complaint, which now contains five causes of action, two of which are against Airborne and the remaining three against Local 295.

The present flurry of motions began when Airborne and Local 295 made motions for summary judgment seeking dismissal of all causes of action in the amended complaint and also for sanctions pursuant to Fed.R.Civ.P. 11. In response, Camporeale made a cross-motion for summary judgment, seeking judgment in his favor on all his causes of action. Local 295 thereafter moved to dismiss the fourth cause of action of Camporeale's amended complaint, which again alleged retaliatory discharge under the LMRDA. On February 22, 1990, the Court notified all parties that it was treating this last motion as one for summary judgment and gave the parties an opportunity to present additional pertinent material since the parties referred to matters outside the pleadings. (*See* Fed.R.Civ.P. 12[b]; *Krijn v. Pogue Simone Real Estate Co.*, 896 F.2d 687 [2d Cir.1990].)

In sum, each party seeks summary judgment in his or its favor as to all of the causes of action in the amended complaint.

## III. DISCUSSION

■ Before turning to the merits of the parties' motions for summary judgment, the Court notes at the outset that on a motion for summary judgment, it may only consider facts that would ordinarily be admissible at trial. *See* Fed.R.Civ.P. 56(e); *see also Anderson v. City of New York*, 657 F.Supp. 1571, 1577 (S.D.N.Y.1987). However, even though an affidavit may contain some inadmissible evidence, the entire affidavit need not be disregarded, but the inadmissible portions will not be considered. *See United States v. Alessi*, 599 F.2d 513, 515 (2d Cir.1979).

In addition, the fact that all parties, as here, move for summary judgment does not mean that the Court must grant judgment to some party. *See Eastman Mach. Co. v. United States*, 841 F.2d 469, 473 (2d Cir.1988). It may, in its discretion, deny all the motions for summary judgment. Further, under Fed.R.Civ.P. 56(c), the mere existence of factual issues is insufficient to defeat a motion for summary judgment, unless they are "genuine" issues of "material" fact. Fed.R.Civ.P. 56(c); *see also Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) ("mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgement").

The Second Circuit recently summarized the applicable standard under Rule 56 as follows:

" 'Summary judgment is appropriate when, after drawing all reasonable inference in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the nonmoving party.' *Lund's, Inc. v. Chemical Bank*, 870 F.2d 840, 844 (2d Cir.1989). To avoid summary judgment, 'the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial*." ' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 [106 S.Ct. 1348, 1356, 89 L.Ed.2d 538] (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added in Matsushita).

Once the nonmoving party has come forward with specific facts in support of his

---

**6.** At that time, Judge Sifton also denied the motions of both defendants for sanctions pursuant to Fed.R.Civ.P. 11.

claim, 'the question of what weight should be assigned to competing permissible inferences remains within the province of the fact-finder at a trial.' *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir.), *cert. denied*, 484 U.S. 977 [108 S.Ct. 489, 98 L.Ed.2d 487] (1987). Finally, '[i]f the party opposing summary judgment "generates uncertainty as to the true state of any material fact, the procedural weapon of summary judgment is inappropriate." ' *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 762 (2d Cir.1983) (quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 445 [2d Cir.1980].)"

(*National Union Fire Ins. Co. of Pittsburgh v. Turtur*, 892 F.2d 199, 203 [2d Cir.1989]).

With these basic principles in mind, the Court now turns to the merits of the parties' contentions.

**a.) The LMRDA Claim Against Local 295:**

In his amended complaint, Camporeale alleges that he was "unlawfully discharged by the defendant" (Amended Complaint ¶ 3), and "was terminated from his employment by defendant *company* without just cause on or about May 2, 1986." (*Id.* ¶ 12) (emphasis added). The fourth cause of action alleges Local 295's violation of the LMRDA.[7]

Although it is not clear from the face of the complaint precisely what provision of the LMRDA Local 295 is alleged to have violated, in his papers opposing this motion, Camporeale specifically relies on section 101(a)(5) of the LMRDA, (29 U.S.C. § 411[a][5] [1982]).[8] Section 101(a)(5) makes it unlawful for a labor organization, such as Local 295, to fine, suspend, expel "or otherwise discipline[ ]" a member thereof for exercising any rights secured by the LMRDA.[9] Stripped to its essentials, Camporeale's argument is that the LMRDA was violated by Local 295 in its processing of his grievance and its decision not to pursue formal arbitration (*i.e.*, Step 3) on his behalf, which, it is alleged, led to his dismissal by Airborne, and therefore constitutes "discipline" within the meaning of section 101(a)(5)[10]. The Court declines to accept Camporeale's strained interpretation of the scope of the LMRDA and accordingly grants summary judgment to Local 295 on the fourth cause of action for the following reasons.

Unlike the facts in *Gross v. Kennedy*, 183 F.Supp. 750 (S.D.N.Y.1960), under any interpretation of the allegations of the complaint, it cannot be disputed that it was Airborne, *not* Local 295, that actually discharged Camporeale. Had the *union* discharged Camporeale from either his employment or from membership in the union[11], then plaintiff's fourth cause of action might survive. Camporeale has not proffered any credible evidence sufficiently supporting the theory that the union caused his discharge. Therefore, Campor-

---

7. The fourth cause of action, in its entirety, reads as follows.

   "By reason of the aforesaid, defendant local union, has engaged in a retaliatory practice unlawful under the LMRDA and has caused plaintiff to suffer grievous and extensive damages, including, but not limited to: extreme emotional distress, lost wages, both past and future, seniority rights, attorney's fees and the costs and disbursements of this action." (Amended Complaint ¶ 35.)

8. *See* Memorandum of Law in Opposition to Motion of Defendant Local Union 295 to Dismiss Plaintiff Camporeale's LMRDA Claim at 2-5.

9. Section 101(a)(5), provides:

   "No member of any labor organization may be fined, suspended, expelled, *or otherwise disciplined* except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing."

   LMRDA, 29 U.S.C. § 411(a)(5) (1982) (emphasis supplied).

10. This court recognizes that the determination of what constitutes "discipline" within the meaning of section 101(a)(5) of the LMRDA is a question of law. *See Galke v. Duffy*, 645 F.2d 118, 120 (2d Cir.1981) (citing *Morrissey v. National Maritime Union*, 544 F.2d 19, 25-26 (2d Cir.1976)).

11. Camporeale's membership in the union was not terminated, but rather he withdrew from Local 295 nearly one month after he was terminated from his employment by Airborne.

eale's *discharge* by Airborne cannot form the basis of an action under section 101(a)(5), since it clearly was not the action of Local 295 that resulted in his termination. To the contrary, there is evidence that at Camporeale's Step 2 hearing, Airborne was firm on dismissal (*see* Camporeale's Affidavit ¶ 58) and that Local 295 suggested to Airborne as an alternative that Camporeale resign upon Airborne supplying a suitable form of reference. (*See* Chardavoyne Affidavit ¶¶ 58–59; Hallahan Affidavit ¶ 12.) The LMRDA simply does not offer protection to a union member from actions undertaken by the employer.

■■■ The Court must next determine whether Camporeale's claims that Local 295's decision not to pursue Step 3 formal arbitration was motivated by either discrimination based on disability or retaliatory practices in response to two petitions he filed earlier, and/or constituted a breach of the union's duty of fair representation; and whether such claims are actionable under the LMRDA. This determination necessarily turns upon the construction of the phrase "or otherwise disciplined" within section 101(a)(5) of the LMRDA.

Under the recent Supreme Court decision of *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6,* — U.S. ——, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989), the Court's construction of that phrase is instructive in this regard. In *Breininger*, Justice Brennan stated that:

> "[B]y using the phrase "otherwise discipline," Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules.
>
> \*   \*   \*   \*   \*   \*
>
> [T]he specifically enumerated types of discipline—fine, expulsion, and suspension—imply some sort of established disciplinary process rather than ad hoc retaliation by individual officers.
>
> \*   \*   \*   \*   \*   \*

The fact that § 101(a)(5) does not prohibit union discipline altogether, but rather seeks to provide 'safeguards against improper disciplinary action,' indicates that 'discipline' refers to punishment that a union can impose by virtue of its own authority over its members."

*Id.* 110 S.Ct. at 438–39.

Here, Local 295 did not seek to, or in fact, impose discipline or punishment directly upon Camporeale. His claim against Local 295, reduced to basics, involves the action or inaction of Local 295 in the *processing* of his grievance. This, Camporeale avers, is "discipline" within the meaning of the statute. Based upon the evidence presented, this Court finds that at no time did Local 295 impose or even recommend "discipline" or punishment for Camporeale. The Court further notes that his claim of retaliation is plainly without merit. Other than the bare assertion that he signed two petitions [12], and the unsupported conclusion that his discharge was in fact due or motivated by retaliation, Camporeale has offered not even a scintilla of evidence to support his motion for summary judgment on these grounds. His claims based on retaliation are wholly unsubstantiated, "except for plaintiff's subjective rationalization that it must have been so" (*Tolentino v. Erickson,* 525 F.Supp. 812, 815 [E.D.N.Y.1981] ), and are therefore rejected by this Court.

As a matter of law, Local 295's processing of the grievance and its determination not to pursue formal arbitration on behalf of Camporeale is not "discipline" or punishment within the meaning of section 101(a)(5) of the LMRDA. Such union activity is simply not covered under the statute and the Court declines to unnecessarily broaden the reach of the LMRDA.

b.) *The Human Rights Claims Against Airborne and Local 295:*

■■■ The gravamen of Camporeale's claim under the New York HRL stems from the allegation that he suffers from depression which, he contends, is a "disability" within the meaning of section 292(21).

---

**12.** *See supra* note 5.

(*See* N.Y.Exec.Law § 292[21] [McKinney 1982 & 1989 Supp.].) In substance, Camporeale avers that his depression, among other ailments [13], prevented him from attending his scheduled work shifts, which he claims was made known to both Airborne and Local 295. (*See* Camporeale Affidavit ¶ 19.) It is apparently because of this alleged disability that he contends that both Local 295 and Airborne discriminated against him by causing his dismissal. As a matter of law, however, these claims must be summarily dismissed.

Section 296, the operative provision of the HRL, prohibits discrimination by an "employer" and "labor organization" on the basis of a "disability." (*See* N.Y. Exec.Law §§ 296[1][a] and [c] [McKinney 1982].) [14] The term "employer," encompasses every employer, except it "does not include any employer with fewer than four persons in his employ." (*Id.* § 292[5].) The phrase "labor organization," is broadly defined as "any organization which exists and is constituted for the purpose, in whole or in part, of collective bargaining or of dealing with employers concerning grievances, terms or conditions of employment, or of other mutual aid or protection in connection with employment." (*Id.* § 292[3].) Clearly, both defendants fit squarely within these respective definitions.

It is the term "disability," however, that is the crux of this claim. "Disability" is "limited to physical, mental or medical conditions *which do not prevent the [employ-* *ee] from performing in a reasonable manner* the activities involved in the job or occupation...." (N.Y.Exec.Law § 292[21] [McKinney 1982 & 1989 Supp.] (emphasis supplied).) Strangely, fatal to Camporeale's claim under the HRL are his contentions that his absences were in fact due to his suffering from a "disability." For even assuming the truth of his allegations that he did in fact suffer from a "disability," it is clear that if the disability actually prevents the employee from reporting to work or performing his job in a reasonable manner, then discharge from employment on that basis does not constitute unlawful discrimination under section 296 of the HRL. This conclusion is supported by the express language of the statute (*see id.*), as well as the cases. *See, e.g., Giaquinto v. New York Tel. Co.,* 135 A.D.2d 928, 929, 522 N.Y.S.2d 329, 330–31 (3d Dep't 1987) (defendant's decision to discharge employee on basis of excessive absences due to "disability" which prevented plaintiff "from reasonably performing her tasks" was not unlawful discrimination); *Matter of Schmitt v. Kiley,* 124 A.D.2d 661, 662, 507 N.Y.S.2d 907, 908 (2d Dep't 1986) (refusal to promote employee on basis of poor attendance record is not discrimination based on disability); *Matter of Halpin v. State Human Rights Appeal Bd.,* 65 A.D.2d 898, 899, 410 N.Y.S.2d 914, 915 (3d Dep't 1978) ("[a] condition which prevents an employee from reporting to work is certainly related to the employee's ability to perform the job

---

**13.** Camporeale maintains that he suffered from "occasional bouts of depression." (Camporeale Affidavit ¶¶ 19, 21, 22.) He also alleges that he told "a number of union and company officials" about this. (*Id.* ¶ 19.) In addition to suffering from "bouts of depression", Camporeale also alleges that he suffered from a "sinus condition" (*id.* ¶¶ 19, 29, 30), "Otitis Media" (*id.* ¶ 24), a "Groin Pull" (*id.* ¶ 25), "temporal pain" (*id.* ¶ 26), "pharyngitis, a sinus and ear infection" (*id.* ¶ 27), and "Chest Pain" (*id.* ¶ 28). It is these ailments that Camporeale claims prevented him from attending work, and which form the basis of his discrimination claim under the LMRDA.

**14.** Section 296 provides in relevant part:
"1. It shall be an unlawful discriminatory practice:
(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, *or disability,* or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment

\* \* \* \* \* \*

(c) For a labor organization, because of the age, race, creed, color, national origin, sex, *or disability* or marital status of any individual, to exclude or to expel from its membership such individual or to discriminate in any way against any of its members or against any employer or any individual employed by an employer."
N.Y.Exec.Law §§ 296(1)(a) and (c) (McKinney 1982) (emphasis supplied).

and employer action motivated by such a condition is permissible").

Moreover, absent an agreement to the contrary, it would clearly be against public policy and common sense to compel an employer to retain the services of an employee who could not, by reason of a disability, report to work or reasonably perform the precise job function the employee was hired to do in the first place. This conclusion is especially pertinent in the field of express courier services.

Accordingly, Camporeale's claims of discrimination based on disability under the HRL must be dismissed as a matter of law against both Airborne and Local 295.

### c.) *The LMRA Claims Against Airborne and Local 295:*

Camporeale next claims that Local 295 breached its duty of fair representation by not proceeding to a Step 3 arbitration, and also that Airborne breached the collective bargaining agreement with Local 295 by terminating Camporeale. The Court's jurisdiction with regard to both of these claims is predicated on section 301 of the LMRA, which confers district courts with jurisdiction over suits alleging violations of collective bargaining agreements between unions and employers, without regard to the amount in controversy. (*See* 29 U.S.C. § 185.)

■ It is settled that an employee may maintain a breach of contract action directly against the employer based upon a collective bargaining agreement, "provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance." *Vaca v. Sipes*, 386 U.S. 171, 186, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967). This is so because failure to prove the union's breach of fair representation gives rise to the employer's successful defense of failure to exhaust contractual remedies. (*Id.* at 183–85, 87 S.Ct. at 913–14.) Thus, when faced with an action such as this where the employee sues both the union and employer based upon breach of the collective bargaining agreement, the first step in the analysis must be whether the union breached its duty of fair representation. If it is shown that the union fairly represented the employee throughout the grievance and in accordance with the terms of the collective bargaining agreement, then the claim against the employer for breach of the agreement necessarily falls. *Cf. Capobianco v. Brink's Inc.*, 543 F.Supp. 971, 975 n. 3 (E.D.N.Y.1982) (where facts show "employee was fairly represented by his union, the subsidiary claim under § 301 for relief from the arbitration award necessarily falls"), *aff'd mem.*, 722 F.2d 727 (2d Cir.1983).

### i. The "Fair Representation" Claim Against Local 295.

In order to prevail on a fair representation claim, the Second Circuit adheres to what has come to be known as the *Vaca–Hines* test, as follows:

"Two elements must be proven for a breach of the duty of fair representation claim: The union's conduct must, first, have been 'arbitrary, discriminatory or in bad faith,' *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967), and second, it must have 'seriously undermine[d] the arbitral process.' *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567, 96 S.Ct. 1048, 1058, 47 L.Ed.2d 231 (1976)."

(*Barr v. United Parcel Service, Inc.*, 868 F.2d 36, 43 [2d Cir.1989].)

■ Negligence or "tactical errors" on the part of the union are insufficient to show a breach of the duty of fair representation (*see id.*), and " 'as long as the union acts in good faith, the courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage.' " *Cook v. Pan American Airways, Inc.*, 771 F.2d 635, 645 (2d Cir.1985), *cert. denied*, 474 U.S. 1109, 106 S.Ct. 895, 88 L.Ed.2d 929 (1986) (quoting *Capobianco* 543 F.Supp. at 975).

■ Camporeale contends that Local 295 breached its duty of fair representation by failing to follow the grievance procedures set forth in either the Agreement or

the February 7 Memo primarily in two respects. First, Camporeale challenges Local 295's processing of his grievance at the Step 2 level by providing him notice of the hearing only hours before, and on the very day of the hearing. (*See* Camporeale Affidavit ¶¶ 50, 51.) He also contends that Local 295 did not adequately consider the evidence presented at the hearing, which consisted of several doctors' notes. (*See id.* ¶¶ 55, 56.) Second, he claims that Local 295's decision not to proceed with his claim to Step 3 was done in an arbitrary and discriminatory manner, and in bad faith.

Applying the *Vaca–Hines* test to the facts of this case, the Court finds that Local 295 did not breach its duty of fair representation to Camporeale, as a matter of law.

In support of his argument that the union did not fairly represent him, Camporeale relies on the "custom" of giving employees "several days" notice of such hearings. (Camporeale Affidavit ¶ 52.) The reason that Camporeale was given notice of his Step 2 hearing on the day of his hearing, was because he had been unexpectedly absent from work the day before. The letter from Chardavoyne advising him of the hearing was prepared on April 30, 1986. Camporeale next appeared at work on May 2. There being no prescribed method or timing in the Agreement or the February 7 Memo as to the notification of employees of Step 2 hearings, Airborne did all it could do under the circumstances, short of awaiting Camporeale's uncertain return from his latest absence to reschedule an additional hearing. Moreover, there is no evidence that the outcome of the hearing would have been different had Camporeale been given more notice.

At the hearing, Airborne advised Local 295 officials that it demanded the dismissal of Camporeale, on the ground that his excessive absences "were disruptive to Company operations," and that he had received countless prior warnings. (Chardavoyne Affidavit ¶ 55; *see also* Hallahan Affidavit ¶ 12.) During deliberations in the absence of Chardavoyne, the representative of Local 295 inquired as to how firm Airborne was on dismissal. Camporeale's personnel file and absentee calendars for the years 1984, 1985 and 1986 were then reviewed [15] and discussed. (*See* Chardavoyne Affidavit ¶ 59; Hallahan Affidavit ¶ 12.) In addition, in response to questioning, the Local 295 Shop Steward acknowledged that Camporeale had been given many chances to improve his record. A final factor in the decision-making process was that Local 295 had taken a similar grievance to arbitration based on excessive absences, and lost.[16] Confronted with these material facts, Local 295 apparently determined that it would be fruitless to pursue arbitration.[17] *See, e.g., Tolentino v. Erickson*, 525 F.Supp. 812, 816 (E.D.N.Y.1981) ("union had wide discretion to determine in good faith when further pursuit of an individual's grievance would be fruitless and a drain upon the union's limited resources").

---

15. Camporeale argues that section 15(L) of the Agreement provides that communications and/or letters regarding an employee's personnel record shall be removed from the file after twelve months from the date of issuance, and once removed, should not be considered or used in any proceeding. As such, he concludes that it was error for Local 295 to consider his file regarding absences except for the year in question. (*See* Camporeale Affidavit ¶ 54.) However, since the decision to terminate Camporeale's employment came as a result of his absences in 1985 and early 1986, clearly those records were properly considered. Indeed, it could even be plausibly argued that Local 295 looked back to early personnel records in search of some evidence that in fact Camporeale's record had improved, thus justifying the pursuance of formal arbitration.

16. *See supra* note 4.

17. It is also not without significance that on that same day another driver, Robert Brocher, was discharged at a Step 2 hearing based on excessive absences. Like Camporeale, Local 295 decided not to take Brocher's case to arbitration either. Brocher thereafter filed an unfair labor practice charge with the National Labor Relations Board ("NLRB"), on the grounds that the union did not fairly represent him at his Step 2 hearing, and that it did not pursue formal arbitration. After due investigation, the NLRB apparently dismissed the charge. (*See* Hallahan Affidavit ¶ 20, Exhibit "C"; Chardavoyne Affidavit ¶ 75.)

Based on this record, it cannot be said that Local 295 acted arbitrarily or in bad faith. There is also no evidence whatsoever that Local 295 acted in a perfunctory fashion in processing Camporeale's grievance. To the contrary, the record amply supports the finding that the grievance process was properly conducted and the decision not to pursue formal arbitration on behalf of Camporeale was carefully considered and made in good faith.

### ii. The Claim Against Airborne.

Since the plaintiff's claim of breach of the duty of fair representation against the union must be dismissed, the breach of contract claim against Airborne of necessity must also fall. (*See Vaca v. Sipes*, 386 U.S. at 186, 87 S.Ct. at 914–15; *Capobianco*, 543 F.Supp. at 975 n. 3.) Accordingly, the plaintiff's breach of contract cause of action against Airborne is dismissed.

### d. *As to Sanctions:*

The rationale underlying the imposition of sanctions under Fed.R.Civ.P. 11 is to "discourag[e] dilatory and abusive litigation tactics and eliminat[e] frivolous claims and defenses, thereby speeding up and reducing the costs of the litigation process." *McMahon v. Shearson/American Express, Inc.*, 896 F.2d 17, 21 (2d Cir.1990); *see also* Fed.R.Civ.P. 11 advisory committee's note, *reprinted in* 97 F.R.D. 165, 198 (1983) ("should ... help to streamline the litigation process by lessening frivolous claims or defenses"). However, as the Second Circuit recently warned us:

> "Rule 11 is not intended to chill an attorney's creative imagination or enthusiastic advocacy on his client's behalf. So long as his pleadings meet the test of reasonableness and are not interposed for what the amendment identifies as improper purposes—that is to say, counsel's actions are not a dilatory or abusive tactic designed to simply delay, harass or cause his adversary needless expense—sanctions are not warranted."

*McMahon*, at 22 (citations omitted).

Applying the "objectively reasonable" test to plaintiff's pleadings and other papers as this Court must, the imposition of sanctions against the plaintiff or his counsel under Rule 11 is not warranted. Accordingly, the motions by both defendants for sanctions are denied in all respects.

### IV. CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment dismissing all of the causes of action in plaintiff's amended complaint are granted. The defendants' motions for attorneys' fees, costs and sanctions are denied as is the plaintiff's cross-motion for summary judgment.

Settle judgment on notice.