Ella SMITH, Plaintiff,

v.

DRUG, CHEMICAL, COSMETIC, PLAS-
TICS AND AFFILIATED INDUSTRIES
WAREHOUSE EMPLOYEES LOCAL
815, affiliated with the International
Brotherhood of Teamsters, and Del Lab-
oratories, Inc., Defendants.

No. CV 93–5729 (MLO).

United States District Court,
E.D. New York.

Aug. 19, 1996.

**226**

Eric Dubinsky, Carle Place, New York, for Plaintiff.

Henry I. Hamburger, Leonia, New Jersey, for Drug, Chemical, Cosmetic, Plastics and Affiliated Industries Warehouse Employees Local 815.

Robert M. Ziskin, Commack, New York, for Del Laboratories, Inc.

### OPINION AND ORDER

ORENSTEIN, United States Magistrate Judge:

Plaintiff commenced this hybrid action pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, alleging that (1) her employer, Del Laboratories ("Del"), discharged her in violation of an existing collective bargaining agreement, and (2) Drug, Chemical, Cosmetic, Plastics and Affiliated Industries Warehouse Employees Local 815 (the "Union"), her collective bargaining representative, breached its duty of fair representation in connection with the termination. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue for this action lies within the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) and (c), as the alleged events in question transpired principally at Del Laboratories, Inc., located in Suffolk County, New York.

Having considered the evidence presented by the parties at trial, the Court makes the following Findings of Fact and Conclusions of Law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure:

### FINDINGS OF FACT [1]

1. Del is an employer within the meaning of Section 2(2) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 152(2), and is engaged in an industry which affects commerce within the meaning of Section 2(6) and (7) of the LMRA, 29 U.S.C. § 152(6) and (7). Del is a corporation with its principal place of business in New York State. (Compl. ¶ 4.)

2. The Union is a labor organization within the meaning of § 2 of the National Labor Relations Act, 29 U.S.C. § 152, and Section 301(b) of the LMRA, 29 U.S.C. § 185(b).

3. Plaintiff Ella Smith began employment with Del in 1984 as an assembler at Del's plant located in Farmingdale, New York. Tr. 12 (1/10/96) (testimony of Ella Smith).[2] Among her duties at Del were boxing certain products, capping bottles, and other various tasks associated with work on an assembly line. *Id.* Plaintiff also frequently served as a line leader. *Id.* 14; Pl.'s Dep. at 5. Line leaders are responsible for, *inter alia,* positioning the workers on the line, instructing them as to the tasks they will be performing on a given shift, and monitoring the overall progress of the line. Tr. 84 (1/24/96) (testimony of Anne White).

4. During Plaintiff's tenure at Del, the Union served as her exclusive collective bargaining representative. Tr. 239 (1/25/96) (testimony of Larry Plotnick). The parties stipulated that Plaintiff was a member in good standing of the Union at the time of her termination. Tr. 39 (1/10/96). The Union's duties included, *inter alia,* negotiating contracts with Del management on behalf of the employees and "handling" any grievances that might arise between an employee and the company. *Id.* Larry Plotnick, the Union's President for the past twenty-three to twenty-five years, performed the foregoing duties on behalf of the Union during Plaintiff's employment. *Id.* On April 14, 1992,

---

**1.** To the extent that a finding of fact constitutes a conclusion of law, it is adopted as such, and to the extent that a conclusion of law constitutes a finding of fact, it is likewise adopted as such.

**2.** References are made to the trial transcript and corresponding page number ("Tr. —").

the Union and Del executed a collective bargaining agreement (the "CBA"), effective January 1, 1992, which remained in effect until December 31, 1994. *See* Pl.'s Ex. 1.

5. Plaintiff was subjected to numerous disciplinary actions during her tenure at Del. On August 1, 1985, Plaintiff received her first warning notice for returning to her work station late on two separate occasions. Del's Ex. 4. The notice commented that Plaintiff "was spoken to several times in the past about her tardiness." *Id.* On February 19, 1988, Plaintiff received a two-and one-half day suspension for "insubordination"; specifically, Plaintiff left her production line for approximately seventeen minutes. When questioned about her absence upon her return to the line, Plaintiff yelled at the production manager, "causing a major interuption [sic] to the [three] lines running in the area." *Id.* On October 21, 1988, Del issued Plaintiff a warning for taking excessive breaks from her line. When questioned by her line leader, Plaintiff threatened "to throw a bottle of nail polish at her." *Id.* A subsequent warning notice on November 1, 1988, whereby the line leader was forced to page Plaintiff to return to her line after a twenty-five minute absence, resulted in a one-day suspension, in addition to the comment that "[Plaintiff] comes [and] goes as she pleases." *Id.*

Del served Plaintiff with a warning notice on February 26, 1990, for taking an excessive amount of time to use the restroom, causing her line to be delayed for fifteen minutes. On June 14, 1990, Plaintiff received a warning notice for leaving her assigned line without authorization and "disturbing girls" on another line that was operating simultaneously. *Id.* Del issued Plaintiff yet another warning for essentially the same infraction on August 2, 1990. *Id.*

On October 7, 1991, Del suspended Plaintiff pending a meeting scheduled for October 15, 1991, for, among other things, insubordination and poor job performance. The October 15, 1991, meeting was attended by Plaintiff; Angela Hubbard, one of the shop stewards; Richard Smith, Del's production manager; Larry Plotnick; and Charles Schneck, Del's director of human resources. *Id.* The disposition of the disciplinary meeting, memorialized in a writing that was signed by Plaintiff, concluded that "[Plaintiff] willfully disobeyed company practices and caused a quality problem which resulted in the rework of 4500 pieces." *Id.* While Del's "initial view was for termination," the company agreed, at the behest of Hubbard, to suspend Plaintiff for one week without pay and place her on probation for six months. *Id.*

Approximately four-and one-half months prior to her termination, Plaintiff received what was to be her final warning notice. Del's Ex. 3. In the notice, dated December 30, 1992, plant manager Richard Smith recommended that, in light of her past violations, Plaintiff be terminated for insubordination and for abandoning the assembly line at which she was scheduled to work. On January 23, 1993, Charles Schneck met with Larry Plotnick to discuss the notice. Tr. 191 (1/24/96) (testimony of Charles Schneck); Tr. 65 (1/10/96) (testimony of Ella Smith). Schneck testified that Plaintiff should have been terminated as a result of this latest incident, but that Plotnick had convinced him to grant Plaintiff a reprieve due to Del's delay in processing the disciplinary form. Tr. 191 (1/24/96) (testimony of Charles Schneck).[3] Pursuant to his meeting with Plotnick, Schneck sent a memorandum to Plaintiff which stated in pertinent part as follows:

> [S]hould you at any time in the future display insubordination or walk off the line without permission or create any other serious disturbance on the work floor, you will be terminated on the spot because of your previous work history.

Del's Ex. 3. Plaintiff testified that, subsequent to the incident, Plotnick advised her that she would not be terminated for "trivial" things, such as "going to the bathroom or coming back to the line late." Tr. 65 (1/10/96) (testimony of Ella Smith). The

---

**3.** In the warning notice dated December 30, 1992, Richard Smith stated that "the delay in issuing [the] warning was to gather prior incidences [sic] by [Plaintiff] from her personnel file."

Court finds, however, that, taking Plaintiff's testimony in this regard to be true, Plotnick's oral statement to her is not inconsistent necessarily with the January 25, 1993, warning memorandum.

## THE EVENTS OF JUNE 3, 1993

6. On June 3, 1993, Plaintiff worked as a line leader on the regular shift at Del, which ran from 7:30 a.m. to 4:30 p.m. During this shift, she was also in charge of running the labeling machine on the line. Tr. 13–14 (1/10/96) (testimony of Ella Smith). Plaintiff was scheduled to work as a regular assembler on the overtime shift that night on a different assembly line, to wit: line 10. *Id.* 14.

7. While the overtime shift ran until 9:00 p.m., there was no fixed time that the line would in fact commence. Two warning bells were sounded at 4:23 p.m. and 4:25 p.m. to give the assembly workers notice that the regular shift was about to end, and to provide them with an opportunity to clean up themselves and their work areas. *Id.* 15. The overtime shift, though scheduled to start promptly at 4:30 p.m., would sometimes be delayed anywhere from five to fifteen minutes while workers arrived from different departments to which they had been assigned on the regular shift. *Id.* 14–15; Tr. 103 (1/24/96) (testimony of Anne White).

8. Particular spots on the assembly line are often filled on a first-come basis. Nevertheless, Plaintiff conceded that the line leader retains ultimate authority to move an assembler to any position the leader deems appropriate or necessary. In short, an assembler has no entitlement to any particular position on any particular line. *Id.* 82. Moreover, no evidence was presented at trial suggesting that an assembly worker could situate herself wherever she pleased or perform whatever work she pleased prior to the formal commencement of the line.

9. Plaintiff testified that when the 4:23 p.m. warning bell rang on June 3, 1993, she immediately left her line and went to line 10, arriving there by 4:24 p.m. Tr. 15 (1/10/96) (testimony of Ella Smith). According to Plaintiff, four assemblers were already seated at various spots on the line when she arrived: Jay Shaw, Veronica Angus, Lorine Conley, and Carmen Leon; Anne White, a Union member who was to serve as line leader that night, had not yet arrived. *Id.* 16, 77. Plaintiff, who desired to perform the same work she had the night before, i.e., hooking products on the clip strip,[4] noticed that Carmen Leon had occupied the spot. *Id.* 81, 85. Plaintiff proceeded to place a chair "at the next available spot where the hooks were." *Id.* 17.

According to Plaintiff, White came over to her and advised her that the spot she was in already was taken. Plaintiff responded that she "want[ed] to do my same job like everybody else is doing," which clearly was a reference to the work she had performed the previous night. *Id.* 17; Tr. 13 (1/24/96) (testimony of Ella Smith). Plaintiff testified that while she audibly repeated words to this effect "more than once or twice," she was not talking to anyone in particular, did not "truly want[ ] her [previous night's] job back," and "was just saying this just to be saying something" to amuse herself. Tr. 79–80, 83 (1/10/96) (testimony of Ella Smith). The Court does not credit Plaintiff's testimony in this regard, finding her explanation to be nonsensical, and finds that Plaintiff was directing her comments toward Anne White, Carmen Leon and/or Lorine Conley.

10. Plaintiff testified that Anne White never directed her to move to another position on the line. *Id.* 90. Instead, Plaintiff testified, White simply paged Richard Smith, the production manager at Del. *Id.* 84. Plaintiff's trial testimony, however, is contradicted by her deposition testimony, in which she specifically recalled White telling her that she "ha[d] to take another position." *See* Del Ex. 5 at 16. Moreover, Plaintiff conceded on cross-examination that White "might have said you have to take a different or another position." Tr. 92 (1/10/96) (testimony of Ella Smith).

When Richard Smith came to the line, he asked Plaintiff if she was refusing a position on the line. After replying that she "want[ed] [her] job back like everybody else,

---

4. Plaintiff had worked the overtime shift on line 10 the previous night, June 2, 1993.

because ... nobody else was on the line," Richard Smith iterated his question, to which Plaintiff responded that she was not refusing a position on the line. *Id.* 17, 85. After proposing to White that she could "tape the hooks on," which was another position on the assembly line, *see* Tr. 85 (1/24/96) (testimony of Anne White), Plaintiff claims that White consented, and that Richard Smith directed her to go to that position, which she proceeded to do. *Id.* 18.

11. Sometime later, "Linda," a supervisor at Del, appeared at the line and spoke to White. *Id.* 20. After witnessing Veronica Angus, Lorine Conley, and White leave and return to the line, Plaintiff became concerned that "they were going to the office about her." She then went to the office of Charles Schneck, director of human resources at Del, and asked to speak with him "about what [had] just happened." *Id.* 21–22. Schneck advised Plaintiff that he would call for her later, and Plaintiff returned to the line. Two or three minutes later, White told Plaintiff that Schneck was ready to see her. When Plaintiff arrived at Schneck's office, Schneck told her that she was insubordinate, and that "this [was] [her] last day working [t]here." Schneck then directed Richard Smith, who also was present, to make sure Plaintiff cleaned out her locker. *Id.* 23, 89. Plaintiff punched out her time card, cleaned out her locker, and left the premises. *Id.* 23.

12. Anne White served as line leader on line 10 during the overtime shift on June 3, 1993. White testified that when she arrived at the line, Veronica Angus, Lorine Conley, and Carmen Leon were already present, but that Plaintiff had not yet arrived. Tr. 90 (1/24/96) (testimony of Anne White). Conley and Leon were seated on the line hooking products on the clip strip. White testified that when Plaintiff arrived at the line, she "wanted to do the job that she did the night before," *id.* 91, which comports substantially with Plaintiff's testimony in this regard. *See* Findings of Fact ¶ 8. White replied that the position already was filled, and repeatedly directed Plaintiff to go to the end of the line. *Id.* 91–93. According to White, Plaintiff refused to move, and started "carrying on" and

being "nasty." *Id.* 92. She called Conley "rubber lips" and "bitch," *id.,* and proceeded to squeeze herself in between Conley and Leon. White then paged Richard Smith to the line. *Id.* 93. When Richard Smith arrived at the line, White advised him that Plaintiff had refused to take a position at the end of the line, and was shoving herself between Leon and Conley in her quest to clip products on the strip. *Id.* 94.

White's testimony was corroborated largely by Conley, Leon, and Angus, all of whom were (and remain) members of the Union. Conley, an eighteen-year employee at Del, testified that she and Angus were the first two people to arrive at line 10 on June 3, 1993; Leon and White arrived soon thereafter. Tr. 120 (1/24/96) (testimony of Lorine Conley). When Plaintiff arrived, Conley and Leon were seated next to one another, in accordance with White's instructions. *Id.* 120–21. Plaintiff proceeded to sit next to Conley,[5] insisting that she wanted the job she had performed the previous night. According to Conley, Plaintiff refused to move despite being directed to do so by White at least three or four times. *Id.* 121–23. During the incident, Conley testified, Plaintiff told Conley to "kiss my ass" and called her a "big rubber lip white people ass kisser" and a "son of a bitch." *Id.* 123.

Leon, a twelve-year employee at Del, testified that when she arrived at line 10 on June 3, 1993, White directed her to sit next to Conley. When Plaintiff arrived at the line, she insisted on taking Conley's position, and then "sat down in [Conley's] lap." Tr. 143–44 (1/24/96) (testimony of Carmen Leon). An argument ensued, with Plaintiff calling Conley "bitch" and "rubber lips." *Id.* 145. At that point, Leon testified, White interceded and told Plaintiff to move to another position "three or four times." Plaintiff did not move. *Id.* 146.

Angus, a twenty-two year employee at Del, testified that prior to Plaintiff's arrival at line 10 on the June 3, 1993, overtime shift, Conley and Leon, at White's direction, were hooking products on the clip strip. Tr. 162–63 (1/24/96) (testimony of Veronica Angus). Ac-

---

5. According to Conley, Plaintiff "practically" was sitting on top of her. *Id.* 121, 130.

cording to Angus, Plaintiff initially told Leon that "she had to get out of [her] spot because [she] worked there the night before, and that was [her] spot." *Id.* 163–64. When Leon informed Plaintiff that White had directed her to sit there, Plaintiff proceeded to sit on Conley's lap. White subsequently told Plaintiff to move to the end of the line three or four times, to no avail. *Id.* 164.

Plaintiff presented Wilhemina Rogers, a twenty-three year employee at Del, to testify on her behalf concerning the events that transpired on June 3, 1993. Rogers testified that she worked the overtime shift on line 10 on June 3, 1993. Tr. 59–60 (1/24/96) (testimony of Wilhemina Rogers). When Plaintiff arrived at the line, Carmen Leon was in the position that Plaintiff had occupied on the line the previous night. *Id.* 60. According to Rogers, Plaintiff told White "twice or three times" that she "wanted [her] old job back just like everybody else has their old job back." *Id.* 69. Rogers's testimony differs from that of Conley, Leon, and Angus, however, in that she claimed that Plaintiff neither engaged in any "discussions" with Angus or Conley, nor ever refused to take a position on the line. *Id.* 65. The Court gives little weight to Rogers's testimony, primarily because her presence at line 10 on the night of June 3, 1993, was not corroborated by anyone, including Plaintiff, or evidenced by any type of log or other documentation. *See* Tr. 27 (1/10/96) (testimony of Ella Smith) ("And so they said who was working that night? And when I named the four ladies that were working, you know, on the line that night, but I said none of them would speak in [sic] my behalf. And I had named Carmen Leon and Jay Shaw and Lorine Con[ley] and Veronica Angus."); Tr. 102 (1/24/96) (testimony of Anne White); Tr. 126 (1/24/96) (testimony of Lorine Conley); Tr. 148 (1/24/96) (testimony of Carmen Leon); Tr. 169 (1/24/96) (testimony of Veronica Angus); Tr. 287–88 (1/25/96) (testimony of Richard Smith).

13. Based on the testimony presented by both sides, the Court finds that when Plain-tiff arrived at line 10 for the overtime shift on June 3, 1993, Carmen Leon and Lorine Conley were sitting at the line prepared to hook products on the clip strip. Plaintiff proceeded to squeeze herself between Leon and Conley in an effort to perform the same work, which she had performed the prior night during the overtime shift; during the incident, Plaintiff called Conley "bitch" and "rubber lips." The Court further finds that, despite Anne White's repeated directions to move to another position, Plaintiff refused to move, stating at least twice that she "wanted her old job back," or words to that effect.

14. Richard Smith, the production manager at Del on June 3, 1993, testified that when he arrived at line 10 in response to Anne White's page, White advised him that she was "having difficulty" getting Ella to assume a position on the line. Tr. 289 (1/25/96) (testimony of Richard Smith). When Richard Smith arrived at line 10, the line had not yet formally commenced. *Id.* 298. According to Smith, when he approached Plaintiff, who at that time was standing between Conley and Leon, who were both seated, *id.* 296, he asked Plaintiff what the problem was. Plaintiff responded that she felt she was entitled to the same position she had the previous night.[6] *Id.* 289. After advising Plaintiff that the position already was filled by Conley and Leon, Plaintiff again claimed a right to the position. *Id.* Smith then asked Plaintiff whether she was refusing a position on the line, at which time Plaintiff proceeded to move toward the end of the line. *Id.* 289, 299. Smith left the line just as Plaintiff started to move. *Id.* 290. Therefore, Smith claims he never saw Plaintiff actually assume a position at the end of the line or commence work on the line. *Id.* 290, 300.

On cross examination, Smith conceded that as he left the line, he intended to terminate Plaintiff as a result of the incident. *Id.* 302. Smith went directly to the office of Charles Schneck, Del's director of human resources, and recommended that Del terminate Plaintiff. Tr. 182 (1/24/96) (testimony of Charles

---

**6.** Plaintiff corroborated Smith's testimony, stating that she told Smith she "want[ed] [her] job back ... because ... nobody else was on the line. They was [sic] still waiting for other people to come for the line to get started." Tr. 85 (testimony of Ella Smith) (1/10/96).

Schneck). After discussing the matter, Smith and Schneck decided to suspend Plaintiff pending a grievance meeting with the Union. *Id.* 183. Plaintiff was then summoned to Schneck's office.[7]

15. Smith, Schneck, and Ulysses "Cuba" Sanchez, one of the Union's shop stewards, were present in Schneck's office when Plaintiff arrived. Tr. 87 (1/10/96) (testimony of Ella Smith). At the meeting, Schneck advised Plaintiff that she was guilty of insubordination for refusing to follow directions. *Id.* 88; Tr. 183–84 (1/24/96) (testimony of Charles Schneck). Smith and Schneck testified that Schneck suspended Plaintiff pending a hearing that would be held at a later date. Tr. 306 (1/25/96) (testimony of Richard Smith); Tr. 184 (1/24/96) (testimony of Charles Schneck). According to Schneck, Del's "normal procedure in [sic] a serious offense is to suspend pending termination." Tr. 184 (1/24/96) (testimony of Charles Schneck).

The testimony of Smith and Schneck, however, is inconsistent with the notice filled out by Richard Smith on June 4, 1993, but dated June 3, 1993. The notice contains the following language:

> DISPOSITION: Termination—See Last Warning and Corresponding Memo [8]

Del Ex. 3. The notice was executed by Richard Smith and Schneck on June 4, 1993, and by Phil Rosenzweig, Del's vice president of manufacturing, shortly thereafter, but in any event prior to June 9, 1993. According to Smith, the disposition was the "recommended" course of action; Schneck testified that, although he agreed to suspend Plaintiff's pending termination, he nevertheless read and signed the notice as it appears. Tr. 303–04 (1/25/96) (testimony of Richard Smith); Tr. 206–07 (1/24/96) (testimony of Charles Schneck). The Court does not cred-

it Smith or Schneck's testimony on this point, and expressly finds that Del terminated Plaintiff on June 3, 1993. Neither Smith nor Schneck proffered any reason as to why the notice did not state "suspended pending termination hearing," or words to that effect. Moreover, past notices issued to Plaintiff were unambiguous; when a disposition was not deemed final, it was stated clearly. *See* Del Ex. 4 (Warning Notice, dated October 21, 1988) ("I *strongly recommend* so [sic] type of disciplinary action against this employee.") (emphasis added); (Warning Notice, dated October 7, 1991) ("Suspension pending meeting on Tues. 10/15/91 ...."); Del Ex. 3 (Warning Notice, dated December 30, 1992) ("It is *recommended* that Ella be terminated for this violation....") (emphasis added). The Court credits Plaintiff's testimony that she was told she was fired on June 3, 1993. *See* Findings of Fact ¶ 9; Tr. 23 (1/10/96) (testimony of Ella Smith) ("I was told that that was my last day working there and that I was fired.").

### POST–TERMINATION EVENTS

16. The relevant Articles of the CBA in effect at the time of Plaintiff's termination provided as follows:

### VI. DISCHARGE AND SUSPENSION

No non-probationary employee shall be discharged or suspended except for good and sufficient cause.

The Union shall be notified, in writing, within two (2) days of any discharge or suspension of any employee; the notice shall state with clarity the reasons for such discharge or suspension.

Should the Union or the employee question the propriety of a discharge or suspension, it shall be made the basis of a grievance. If, within five (5) days, excluding Saturdays, Sundays and contract holi-

7. It is unclear who told Plaintiff to go to Schneck's office. Plaintiff testified that White, upon White's return to the line, told her Schneck wanted to see her. Tr. 22, 86 (1/10/96) (testimony of Ella Smith). White, Richard Smith, and Schneck, however, testified that Smith returned to the line to get Plaintiff. Tr. 96 (1/24/96) (testimony of Anne White); Tr. 306 (1/25/96) (testimony of Richard Smith); Tr. 183 (1/24/96) (testimony of Charles Schneck). In any event, the Court

concludes that it need not make a finding on this point.

8. The "Last Warning and Corresponding Memo" that the notice refers to relates to the incident of December 30, 1992, in which Plaintiff received a memorandum threatening "terminat[ion] on the spot" should she in the future display insubordination on the line. *See* Del Ex. 3; Findings of Fact ¶ 3 at 4.

days, after receipt by the Union of such notice of discharge or suspension, no written notice shall have been given to the Employer of the intention of the Union or the employee to protest the discharge, the right to question such discharge or suspension shall be deemed to have been waived.

A hearing for the discharged or suspended employee shall be held within three (3) days (excluding Saturdays, Sundays and contract holidays) after notice of protest is submitted to the Company. The employee, the Shop Steward, and representatives of the Union shall have the right to be present and participate at such hearing. If such discharge or suspension case is not satisfactorily disposed of at the hearing, the matter may be submitted to arbitration as hereinafter provided within fifteen (15) calendar days. The arbitrator may (1) sustain the discharge or suspension; (2) reduce the penalty; (3) order the employee reinstated with back pay; or (4) make such other disposition as to him/her shall seem just.

. . . .

IX. *GRIEVANCE PROCEDURE AND ARBITRATION*

Any dispute or grievance between the Employer and its employees or the Union, growing out of the interpretation or application of any clause of this agreement, shall be settled in the following manner:

STEP 1. The employee, within two (2) working days after the grievance shall have arisen, may discuss this matter with his/her Supervisor, who shall attempt to adjust the matter within forty-eight (48) hours after its presentation to him/her.

STEP 2. If the matter shall not have been adjusted at STEP 1, within the forty-eight (48) hour period specified, it may within two (2) working days thereafter, be submitted, in writing, to the Plant Manager by the Shop Steward. The Plant Manager shall attempt to adjust the matter within three (3) working days after it shall have been presented to him/her.

STEP 3. If the dispute shall not have been adjusted by STEP 2, it may be submitted to arbitration by either party within ten (10) days after the expiration of the period limited by STEP 2. The Arbitrator shall be designated for this purpose by agreement between the parties, or, if such agreement cannot be reached, the Arbitrator shall be designated by the American Arbitration Association.

The arbitration shall proceed in accordance with the rules of the American Arbitration Association, then obtaining. The costs of the arbitration shall be borne equally by the Union and the Employer. The failure of either party to submit an arbitrable dispute to arbitration within the time limit set by this paragraph shall be conclusively deemed to be a waiver of its rights thereto, and of the claim upon which it is based.

Nothing herein contained shall be construed as depriving the Employer and/or the Union of the right to initiate and process a grievance directly with each other and thereafter to utilize the arbitration procedures of this paragraph. The arbitrator's decision shall be final and binding on the parties to this Agreement.

It is understood and agreed that questions involving changes in or additions to the terms and provisions of this Agreement shall not be subject to the foregoing grievance procedure or to arbitration.

All consultations regarding grievances through the first two (2) STEPS of the grievance machinery, provided for in this Article, shall take place on the Employer's time and one [sic] the Employer's premises. During a grievance at STEP 2, as provided herein, the employees' committee (excluding the Union representatives) for this purpose shall be limited to the Shop Steward (or in his absence another committeeman), and the grievant. The Employer shall not be responsible or obligated to pay for time lost in Arbitration hearings.

17. As a matter of course, neither Del nor the Union utilized the formal procedure set forth in Article VI of the CBA when an employee was suspended or terminated; specifically, the Union did not demand written notification within two days of an employee's suspension or termination, and Del correspondingly did not demand written notifica-

tion within five days thereafter of the Union or employee's desire to protest the disciplinary action taken against the employee. Instead, once being notified by Del of such an action, the Union would initiate the grievance procedure orally, a process that both parties interpreted as being in accordance with Article IX, ¶ 6 of the CBA. Tr. 199 (1/24/96) (testimony of Charles Schneck); Tr. 268–69, 278 (1/25/96) (testimony of Larry Plotnick). In point of fact, Schneck testified that of the estimated twenty to thirty grievance meetings held during his nine-and one-half year tenure as director of human resources at Del, neither Del nor the Union had ever utilized the formal procedure set forth in Article VI of the CBA. Tr. 221 (1/24/96) (testimony of Charles Schneck). Plotnick corroborated Schneck's testimony, stating that in his twenty-five years of processing grievances on behalf of Del's employees, he always has initiated the grievance procedure verbally by immediately contacting the company to set up a hearing. Tr. 268 (1/25/96) (testimony of Larry Plotnick). Moreover, Del never took the position that Plaintiff had waived her right to protest her discharge by virtue of her or the Union's failure to comply with Article VI of the CBA. *Id.* 277.

18. Union shop steward Sanchez called Union president Larry Plotnick on June 4, 1993, and advised him of the situation with Plaintiff. Tr. 240 (1/25/96) (testimony of Larry Plotnick). Schneck also called Plotnick that day and told him there was "a problem with Plaintiff." *Id.*; Tr. 210 (1/24/96) (testimony of Charles Schneck). In response, Plotnick advised Schneck that he would set up a grievance hearing the following Wednesday, June 9, 1993; Plotnick directed Sanchez to contact Plaintiff and tell her to meet Plotnick that day at the plant. Tr. 240 (1/25/96) (testimony of Larry Plotnick).

19. When Plotnick arrived at Del on June 9, 1993, he went to Schneck's office and obtained the June 3, 1993, notice. *Id.* 241, 255–56. Prior to the commencement of the grievance meeting, Plaintiff had an opportunity to meet with Plotnick to discuss what had transpired on June 3, 1993. Tr. 24, 70 (1/10/96) (testimony of Ella Smith). Plotnick testified that Plaintiff told him that when Anne White directed her to move, she replied that she wanted to perform the job she had the night before. Plaintiff stated that she complied with White's direction to go to the end of the line. Tr. 241 (1/25/96) (testimony of Larry Plotnick). According to Plaintiff, however, she and Plotnick never discussed what transpired on June 3. Instead, Plaintiff was interested in telling Plotnick what had happened on line 10 the previous night, June 2, as she felt it "might have led up to [her] being terminated." Tr. 24 (1/10/96) (testimony of Ella Smith). Plotnick advised Plaintiff that "they" were only interested in what had happened on June 3, and the Court credits Plaintiff's testimony in this regard.[9]

20. After speaking with Plaintiff, Plotnick spoke with White about the incident. According to Plotnick, White recounted that Plaintiff had placed herself between Conley and Leon and "basically was sitting on [Conley's] lap." Tr. 242 (1/25/96) (testimony of Larry Plotnick). White told Plaintiff "numerous times" to move to the end of the line, but Plaintiff "insisted" on staying where she was. *Id.* White also told Plotnick that after paging Richard Smith to the line, Plaintiff told Smith she "want[ed] [her] job back like everybody else," at which time Smith asked Plaintiff if she was refusing to work. Plotnick could not remember whether White stated that Plaintiff answered Smith's question in the negative, but that White told him Plaintiff did not go to the end of the line. *Id.* 242, 259–60. Plotnick did not speak with Richard Smith because, as a matter of policy, he will speak with management personnel

---

**9.** While Plaintiff claims in her Post–Trial Memorandum that she may have been "set up" on June 3 because of what occurred on line 10 the previous night, no testimony was presented at trial as to what happened on June 2. The only account is set forth in Plaintiff's deposition testimony, wherein she states that Veronica Angus screamed "bitch" at her for allegedly failing to move out of the way when Angus passed her with a hand jack under her arm. *See* Del Ex. 5 at 38–39. When Richard Smith came to the line in response to Angus's scream, Angus told Smith that Plaintiff would not move out of the way, to which Plaintiff replied that "[Angus] didn't say a word." *Id.* at 39. Apparently, Plaintiff was not aware that Angus was about to pass her. Richard Smith said to "cut it out," although it is unclear to whom he was speaking, and the incident ended.

only in the presence of Schneck. *Id.* 262. The Court credits Plotnick's testimony, and notes that it comports substantially with the testimony of White, Angus, Leon, and Conley, as well as much of Plaintiff's.

21. Shortly after Plotnick spoke with White, a meeting was held in Schneck's office. Plaintiff, Plotnick, Schneck, Smith, and Sanchez were present. Tr. 69 (1/10/96) (testimony of Ella Smith). Schneck commenced the meeting by stating that Plaintiff had subjected herself to discipline for the following: refusing to move to a spot designated by the line leader, making a scene, using foul language, and sitting in one of the employee's laps. Tr. 188 (1/24/96) (testimony of Charles Schneck). Plaintiff gave her account of the incident, insisting that she had not been insubordinate because White "hadn't told her anything to do." Tr. 25 (1/10/96) (testimony of Ella Smith).

22. At some point, Anne White was called into the meeting. Plaintiff "didn't pay attention to what [White] was actually saying because [she] knew [she] wasn't insubordinate." Tr. 27 (1/10/96) (testimony of Ella Smith); *see* Tr. 24–25 (1/24/96) (testimony of Ella Smith) (1/24/96). White's account at the meeting largely paralleled the version she related to Plotnick. *See* Tr. 99–100 (1/24/96) (testimony of Anne White); Tr. 243–44 (1/25/96) (testimony of Larry Plotnick).

23. After White left the meeting, Plotnick asked Plaintiff whether she had any other witnesses she wished to call. Tr. 27, 71 (1/10/96) (testimony of Ella Smith); Tr. 232 (1/25/96) (testimony of Ella Smith). Plaintiff replied that no one would speak on her behalf. Tr. 27, 71 (1/10/96) (testimony of Ella Smith). Plaintiff never told Plotnick that Wilhemina Rogers had been working on line 10 on June 3, or that Rogers could support her version of events in any respect. Tr. 231 (1/25/96) (testimony of Ella Smith). Schneck then asked Plaintiff who else was present on line 10 on June 3. She named Conley, Leon, Angus, and Shaw. Tr. 27 (1/10/96) (testimony of Ella Smith). At some point, Leon was called into the meeting. While Plaintiff could not recall anything Leon said at the meeting, Leon corroborated White's version of the events. Tr. 190 (1/24/96) (testimony of

Charles Schneck); Tr. 244 (1/25/96) (testimony of Larry Plotnick); Tr. 294 (1/25/96) (testimony of Richard Smith).

24. At that point, Schneck reminded Plotnick of the prior warning Plaintiff had received in January 1993. Tr. 190–91 (1/24/96) (testimony of Charles Schneck); *see* Findings of Fact ¶ 5 at 5. Plotnick appealed on Plaintiff's behalf, noting her length of service and pointing out that it had been six months since the issuance of the last warning. Tr. 246 (1/25/96) (testimony of Larry Plotnick) (1/25/96); Tr. 192 (1/24/96) (testimony of Charles Schneck). Schneck rebuffed Plotnick's appeal. He proceeded to prepare a writing that documented the grievance meeting, and gave Plotnick a copy. Tr. 245 (1/25/96) (testimony of Larry Plotnick). Plaintiff also was given a copy of the documents, Tr. 49, 53 (1/10/96) (testimony of Ella Smith) (1/10/96), and signed a lined white sheet of paper evidencing her receipt of same. *See* Del's Ex. 8. The first page of the packet of documents was a Memorandum from Schneck to Plaintiff which read as follows:

> Meeting held with L. Plotnick, C. Schneck, E. Sanchez, R. Smith, E. Smith.
>
> A review of the incident was made. Ella denied that Anne White told her to go to another position. Anne White was called in and stated she told Ella to go to a position at the end of the line.
>
> Ella repeatedly contradicted herself while giving her testimony. Carmen Leon was called in as a witness at the request of Ella and confirmed Anne White's story.
>
> Ella is terminated.

Del Ex. 3. The packet of documents also contained the notice of June 3, 1993, which had been executed by Schneck, Richard Smith, and Phil Rosenzwieg, *see* Findings of Fact ¶ 15, as well as the January 25, 1993, Memorandum from Schneck to Plaintiff in connection with the December 30, 1992, warning notice. *Id.*

25. Prior to leaving the plant on June 9, 1993, Plaintiff had a chance to speak with

Plotnick.[10] Plaintiff told Plotnick that she felt it was unfair for the company to terminate her, and that she "would like a grievance meeting." Tr. 33 (1/10/96) (testimony of Ella Smith). The Court finds, however, that the meeting held in Schneck's office on June 9, 1993, was in fact a "grievance" meeting, and that the Union understood her request as one for *another* grievance meeting. No other interpretation of the June 9, 1993, meeting is reasonable. Union and management officials were present at the meeting. In addition, Anne White (line leader/union member), Richard Smith (plant manager), and Carmen Leon (assembler/union member), principal actors in the events that culminated in Plaintiff's termination, gave their respective accounts of the incident. Most important, Plaintiff herself was given the chance to present her side of the story and call witnesses on her behalf; Plaintiff conceded that she had been afforded a full opportunity to present her case at the meeting. Tr. 71 (1/10/96) (testimony of Ella Smith). Plotnick asked Plaintiff for her telephone number, and Plaintiff gave him two numbers. *Id.* 33–34.

26. On June 11, 1993, a Union meeting was held to discuss Plaintiff's discharge. Tr. 247 (1/25/96) (testimony of Larry Plotnick). Present at the meeting were Plotnick, Benjamin Camadeco, the Union's Secretary–Treasurer, and Henry I. Hamburger, the Union's attorney. *Id.* 247–48. The express purpose of the meeting was to discuss whether further action should be taken on Plaintiff's behalf, such as insisting on arbitration. *Id.* 248. The Union decided not to take any further official action, but authorized Plotnick to take "one more shot" at convincing Schneck to reinstate Plaintiff. *Id.* On June 16, 1993, Plotnick visited Schneck at Schneck's office and asked him to reduce Plaintiff's termination to a suspension, citing her long-term employment at Del. *Id.* 249;

Tr. 197 (1/24/96) (testimony of Charles Schneck). Schneck refused to reinstate Plaintiff, based largely upon her disciplinary history with the company. Tr. 197 (1/24/96) (testimony of Charles Schneck).

27. On June 18, 1993, Plotnick again met with Camadeco and Hamburger. In light of Plaintiff's disciplinary record at Del, as well as the fact that no one could corroborate Plaintiff's version of events, the Union decided not to proceed to arbitration. Tr. 250 (1/25/96) (testimony of Larry Plotnick). After the meeting, Plotnick attempted to telephone Plaintiff. *Id.* One of the telephone numbers Plaintiff had given him turned out to be erroneous. *Id.* 250–51; Tr. 46 (1/24/96) (testimony of Ella Smith). Plotnick tried unsuccessfully to reach Plaintiff at the other number Plaintiff had given him. Tr. 251 (1/25/96) (testimony of Larry Plotnick).

28. Plaintiff contacted Plotnick on or about July 1, 1993, to discuss the possibility of getting her job back.[11] Tr. 34–35 (1/10/96) (testimony of Ella Smith) (1/10/96). During this conversation, it came to light that Plaintiff had been denied unemployment benefits. *Id.* Plaintiff advised Plotnick that she was appealing the decision. *Id.* 35. Plotnick told Plaintiff to call him if she was successful in her appeal, at which time he would "see what [he could] do with the company." *Id.* 35; Tr. 252 (1/25/96) (testimony of Larry Plotnick).

29. Sometime in late August 1993, Plaintiff again telephoned Plotnick. Tr. 39–40 (1/24/96) (testimony of Ella Smith). She advised him that her appeal had been denied; nevertheless, she again requested that Plotnick help her get reinstated at Del. *Id.* Plotnick replied that there was nothing further he could do. *Id.*

30. Plaintiff spoke with Plotnick for the final time in September, 1993. At this point, Plaintiff knew that the Union was not going to take any further action with respect to her

---

10. According to Plaintiff, she spoke with Plotnick prior to her receipt of the packet of documents containing the June 9, 1993, Memorandum from Schneck. Tr. 33 (testimony of Ella Smith) (1/10/96). Plotnick, however, testified that he spoke with Plaintiff subsequent to her receipt of the documents. Tr. 247 (testimony of Larry Plotnick) (1/25/96).

11. The Court does not credit Plotnick's testimony that he called Plaintiff on the telephone prior to July 1 to advise her that the Union "couldn't get her to work," to which Plaintiff allegedly responded "thank you for your help," and nothing else. *See* Tr. 251 (testimony of Larry Plotnick) (1/25/96).

termination. Instead, Plaintiff asked Plotnick whether the Union could represent her at a hearing she had requested subsequent to her unsuccessful appeal from the denial of unemployment benefits. *Id.* 37, 40–41; Tr. 252 (1/25/96) (testimony of Larry Plotnick). Plotnick informed Plaintiff that the Union did not get involved in matters relating to unemployment benefits. Tr. 252 (1/25/96) (testimony of Larry Plotnick).

31. Plaintiff commenced the instant action on December 17, 1993.

## CONCLUSIONS OF LAW

### I. *The Statute of Limitations*

Del argues that Plaintiff's cause of action is time-barred, contending that Plaintiff was on notice on June 9, 1993, at the latest, that the Union would take no further action with respect to her termination. Plaintiff, on the other hand, maintains that she was not advised until sometime in August 1993 that no further steps would be taken on her behalf by the Union. Therefore, Plaintiff urges, the commencement of the instant action on December 17, 1993, falls well-within the limitations period.

■ In the seminal case of *DelCostello v. International Bhd. Of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the United States Supreme Court established a six-month limitations period for hybrid Section 301/fair representation actions. *Id.* at 172, 103 S.Ct. at 2294–95. The date the limitations period begins to accrue "is not necessarily the date that the employee is notified of a final adverse determination with respect to a grievance." *Demchik v. General Motors Corp.*, 821 F.2d 102, 105 (2d Cir. 1987). Instead, the period begins to run "when a plaintiff knows or reasonably should know that the union has breached its duty of fair representation.'" *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1492 (2d Cir.1995) (quoting *Flanigan v. Truck Drivers Local 671*, 942 F.2d 824, 827 (2d Cir.1991)).

In the case at bar, the Union president, Larry Plotnick, testified that the Union decided definitively not to take Plaintiff's case to arbitration on June 18, 1993, subsequent to Plotnick's informal meeting with Charles Schneck, Del's director of human resources. *See* Findings of Fact ¶ 27. Even crediting, which the Court did not, Plotnick's testimony that he thereafter telephoned Plaintiff sometime between June 18 and June 22 to tell her the Union "couldn't get her back to work," the commencement of this action on December 17, 1993, falls within the six-month limitations period.

■ In any event, Plotnick's direction to Plaintiff during their July 1, 1993, telephone conversation to contact him should her appeal of the denial of unemployment benefits prove successful, at which time he would "see what [he could] do with the company," hardly manifests an unequivocal intention by the Union that it would no longer represent Plaintiff's interests with respect to the termination. Not until sometime in August 1993, after Plaintiff advised Plotnick that her appeal had been denied, and Plotnick stated there was nothing further he could do, did the limitations period begin to run. *See Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 165 (2d Cir.1989) ("Where a union ... decides to stop assisting a member, ... a breach of duty by the union is apparent to the member at the time she learns of the union ... inaction about which she complains."). Accordingly, Plaintiff's action was filed timely.

### II. *The Section 301/Fair Representation Hybrid Cause of Action*

#### A. *Introduction*

■ A Section 301 hybrid cause of action brought by an employee involves two constituent claims. The suit against the employer is grounded upon Section 301 because the employee is claiming that the employer violated the provisions of a collective bargaining agreement. The grievance procedures set forth in collective bargaining agreements, however, as is the case here, usually provide the exclusive means for resolving industrial labor disputes; consequently, the employer is entitled to rely upon the finality of a grievance decision reached with the union, who is acting as the individual employee's exclusive collective bargaining

representative. Therefore, to be entitled to judicial review of the claim, an employee must show a breakdown in the grievance process itself. Accordingly, the second claim in a hybrid cause of action is against the Union for breach of its duty of fair representation. *See DelCostello,* 462 U.S. at 164, 103 S.Ct. at 2290–91. Nevertheless, the two claims are "inextricably interdependent," and it is not enough that an employee demonstrates a breach of the collective bargaining agreement by her employer. To be successful against *either* the employer or the union, the employee first must shoulder her burden of establishing the union's breach of its duty. *Id.* at 164–65, 103 S.Ct. at 2290–91; *Young v. United States Postal Serv.,* 907 F.2d 305, 307 (2d Cir.1990).

### B. The Union's Duty of Fair Representation

■ A union's duty to represent fairly its employees is not codified; instead, it "is implied under the scheme of the National Labor Relations Act." *DelCostello,* 462 U.S. at 164, 103 S.Ct. at 2290. Generally, " 'as the exclusive bargaining representative of the employees, ... the Union ha[s] a statutory duty fairly to represent all of those employees, both in its collective bargaining ... and in its enforcement of the resulting collective bargaining agreement.' " *United Steelworkers of Am. v. Rawson,* 495 U.S. 362, 372, 110 S.Ct. 1904, 1911, 109 L.Ed.2d 362 (1990) (quoting *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909–10, 17 L.Ed.2d 842 (1967)). To establish the Union's breach of its duty of fair representation, Plaintiff must demonstrate that, in processing her grievance, the Union's conduct was " 'arbitrary, discriminatory, or in bad faith,' " *Samuels v. Air Transp. Local 504,* 992 F.2d 12, 16 (2d Cir. 1993) (quoting *Vaca,* 386 U.S. at 190, 87 S.Ct. at 916–17), or, alternatively, " 'seriously undermined the arbitral process.' " *Samuels,* 992 F.2d at 16 (quoting *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 567, 96 S.Ct. 1048, 1057–58, 47 L.Ed.2d 231 (1976)).

■ Courts have afforded unions a considerable amount of discretion in grievance matters. *See, e.g., Ayala v. Union de Tronquistas de Puerto Rico, Local 901,* 74 F.3d 344, 346 (1st Cir.1996) (" 'In the context of employee grievances, the duty of fair representation is not a straitjacket which forces unions to pursue grievance remedies under the collective bargaining agreement in every case where an employee has a complaint against the company.... A union is accorded considerable discretion in dealing with grievance matters, and it may consider the interests of all its members when deciding whether or not to press the claims of an individual employee.' " (quoting *Seymour v. Olin Corp.,* 666 F.2d 202, 208 (Former 5th Cir.1982))); *Peterson v. Kennedy,* 771 F.2d 1244, 1254 (9th Cir.1985) ("It is for the union, not the courts, to decide whether and in what manner a particular grievance should be pursued."), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986); *Freeman v. O'Neal Steel, Inc.,* 609 F.2d 1123, 1126 (5th Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980); *Smith v. ITT Std.,* 834 F.Supp. 612, 617 (W.D.N.Y.1993). " 'As long as the Union acts in good faith, the courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage.' " *Cook v. Pan American World Airways, Inc.,* 771 F.2d 635, 645 (2d Cir.1985) (quoting *Capobianco v. Brink's, Inc.,* 543 F.Supp. 971, 975 (E.D.N.Y.1982), *aff'd,* 722 F.2d 727 (2d Cir.1983)), *cert. denied,* 474 U.S. 1109, 106 S.Ct. 895, 88 L.Ed.2d 929 (1986).

■ In processing a grievance, "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational." *Air Line Pilots Ass'n v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991) (citation omitted) (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953)); *see also N.L.R.B. v. Local 282, International Bhd. Of Teamsters,* 740 F.2d 141, 147 (2d Cir.1984) ("[A]rbitrary conduct is not limited to intentional conduct by union officials but may include acts of omission which, while not calculated to harm union members, 'may be so egregious, so far short of minimum standards of fairness to the em-

ployee and so unrelated to legitimate union interests as to be arbitrary.'" (quoting *Robesky v. Qantas Empire Airways, Ltd.,* 573 F.2d 1082, 1089–90 (9th Cir.1978))). Moreover, "[t]he duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." *Cruz v. Local Union Number 3 of the Int'l Bhd. Of Elec. Workers,* 34 F.3d 1148, 1154 (2d Cir.1994).

Plaintiff presents two primary arguments in her Post–Trial Memorandum in support of her contention that the Union acted arbitrarily in representing her interests following her termination. First, she claims that the Union "constructively deemed plaintiff's protest [of her termination] to have been *waived,*" by virtue of its failure to abide by the grievance notification provisions set forth in Article VI of the CBA. Pl.'s Post–Trial Mem. at 8. Second, Plaintiff mounts a general attack on the Union's investigation of the events surrounding her termination, and its alleged failure to present any type of defense on her behalf. The Court will explore each of these arguments in turn.

### 1. The Grievance and Arbitration Provisions of the CBA

Plaintiff claims that the Union's conduct was arbitrary because it (1) waived her right to protest her termination by failing to serve written notice upon Del within five days of its receipt of Del's notice of her termination; (2) failed to raise in her defense the fact that Del did not serve written notice upon the Union that she had been terminated within two days of taking such action; and (3) failed to advise her of her right to file individually a grievance with Del.

In *Caputo v. National Ass'n of Letter Carriers,* 730 F.Supp. 1221 (E.D.N.Y.1990), Judge Glasser squarely addressed the issue of whether a union's failure to file timely a grievance on behalf of an employee could constitute a breach of its duty of fair representation. 730 F.Supp. at 1224. Pointing

out that, under well-settled Second Circuit law, "neither tactical errors nor ordinary negligence constitute a breach of the duty of fair representation," *id.* at 1225, the narrow issue for the court was whether the union's untimely filing was "a mere mistake or error o[f] judgment." *Id.* at 1226. Drawing upon precedent from the Sixth and Ninth Circuits, the *Caputo* court held that "[t]he failure to perform a ministerial task where the individual interest is strong [12] and where the result virtually extinguishes the claim is the sort of omission that is properly subject to judicial recourse because it does not interfere with the union's discretion." *Id.* at 1229.

*Caputo* is distinguishable from the instant case. There, the employer repeatedly refused to entertain a grievance on the grounds that it was filed untimely. *Id.* at 1223–24. Moreover, citing the cases of *Ruzicka v. Gen. Motors Corp.,* 649 F.2d 1207 (6th Cir.1981), *on remand,* 519 F.Supp. 893 (E.D.Mich.1981), *aff'd,* 707 F.2d 259 (6th Cir.), *cert. denied,* 464 U.S. 982, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983), and *McLain v. Wilson,* 591 F.Supp. 474 (D.Md.1984), the *Caputo* court recognized that the untimely filing of a grievance would not *always* provide an employee with a fair representation claim. In *Ruzicka,* the union argued that it had failed to file timely an employee's grievance statement in reliance on "a prevailing practice of [both the union and the company of] freely granting extensions of time for the exchange" of such statements. 649 F.2d at 1210. Nevertheless, the district court held that the untimely filing constituted unfair representation as a matter of law. *Id.* at 1209. The Sixth Circuit remanded the case to the district court to address the issue of the union's reliance on past practice in processing the employee's grievance, noting that if in fact the union's untimely filing was based upon such reliance, the union would thereby be relieved of liability. *Id.* at 1211. The Sixth Circuit reasoned as follows:

> In relying on a past practice, a union's omission is based on a wholly relevant consideration, is not intended to harm its

12. Where the subject of the grievance concerns an employee's discharge, the individual interest is presumed to be strong. *See also Caputo,* 730

F.Supp. at 1228 (citing *Dutrisac v. Caterpillar Tractor Co.,* 749 F.2d 1270, 1274 (9th Cir.1983)).

member, and is not the type of arbitrariness which reflects reckless disregard for the rights of the individual employee. Such conduct, at times, manifests no more than ordinary negligence and we cannot hold a union liable for breach of the duty of fair representation based upon simple negligence.

*Id.* at 1212; *see Giordano v. Local 804, International Bhd. of Teamsters,* 634 F.Supp. 953, 957 (S.D.N.Y.1986) (finding no breach of duty of fair representation for untimely filing of arbitration request where "[i]n reliance on the past practice that [the company] would not invoke the ten-day filing deadline as a defense to arbitration, [the union] had no reason to believe the delay would jeopardize [the employee's] grievance"); *McLain,* 591 F.Supp. at 478 ("Where ... the union knew that the company would not alter its practice of allowing—without exception—late appeals [of grievances], the union did not breach its duty of fair representation."). In all of the foregoing cases, the union had an articulable basis for processing grievances in the manner in which they did, thereby taking their actions out of the realm of arbitrariness.

The facts in the case at bar are more favorable to the Union. Unlike in *Giordano, Ruzicka,* and *McLain,* Del *never* took the position that Plaintiff's right to grieve her termination had been waived. Consistent with the parties' practice of some twenty-five years, neither Del nor the Union held the other to the formal notification provisions of Article VI of the CBA. Findings of Fact ¶ 17. Instead, the grievance was processed informally by the parties, which both Del and the Union felt comported with Article IX, ¶ 6 of the CBA. Findings of Fact ¶¶ 17–18. Moreover, despite Plaintiff's protestations to the contrary, the Court has found that the June 9, 1993, meeting held in the office of Charles Schneck was in fact a grievance meeting. *See* Findings of Fact ¶ 25 & n. 10. Accordingly, Plaintiff's argument is turned on its head. Nevertheless, Plaintiff attempts to push her argument a step further, asserting that "any arbitrator would be bound by the collective bargaining agreement and [Article VI]." Pl.'s Mem. at 8. According to Plaintiff, the Defendants' position that they never held each other to the Article VI time requirements is "irrelevant and self-serving—as an impartial arbitrator would be governed by the [CBA] agreement." *Id.*

 Plaintiff's argument is not persuasive, and gives short shrift to the unique treatment courts have accorded collective bargaining agreements:

A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. It is a generalized code to govern a myriad of cases which the draftsman cannot wholly anticipate. The collective bargaining agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant.

*Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 311–12, 109 S.Ct. 2477, 2485, 105 L.Ed.2d 250 (1989) (citations and internal quotations omitted). Consistent with the foregoing, "the parties' 'practice, usage and custom' is of significance in interpreting their agreement," *Consolidated Rail,* 491 U.S. at 311, 109 S.Ct. at 2485 (quoting *Transportation Union v. Union Pacific R.R.,* 385 U.S. 157, 161, 87 S.Ct. 369, 371–72, 17 L.Ed.2d 264 (1966)), and parol evidence may be used freely. *See Southeastern Pennsylvania Transp. Auth. v. Brotherhood of R.R. Signalmen,* 882 F.2d 778, 784 (3d Cir.1989) (collecting cases from other circuits). While an arbitrator may not interpret a collective bargaining agreement in a way that contradicts its plain language, *see Local 1199, Drug, Hospital and Health Care Employees Union v. Brooks Drug Co.,* 956 F.2d 22, 25 (2d Cir.1992), such is not the case here. Both the Union and Del have interpreted an express provision of the CBA, Article IX, ¶ 6, as enabling them to bypass Article VI when processing a grievance. They have adhered consistently to this interpretation, and the Court cannot say it is unreasonable.

 Finally, Plaintiff faults the Union for failing to advise her of her right to file an individual grievance with Del. Pl.'s Mem. at

9. This contention also lacks merit, as employees are imputed with knowledge of the grievance procedures set forth in their collective bargaining agreements. *See Tran v. Tran*, 847 F.Supp. 306, 311 (S.D.N.Y.1994), *rev'd on other grounds*, 54 F.3d 115 (2d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996); *cf. Alicea v. Suffield Poultry, Inc.*, Civ. No. 85–0461–F, 1988 WL 412246, at *9 (D.Mass. Oct. 17, 1988) ("Even assuming that the Union failed to convey the grievance procedure mechanisms to the [employees], such conduct does not exceed negligence in the performance of its duties and therefore does not rise to the level of breach of duty of fair representation.").

### 2. The Union's Investigation

Briefly, the Union's investigation of the events surrounding Plaintiff's termination went as follows. When Union president Larry Plotnick was notified of Plaintiff's termination by Charles Schneck, Del's director of human resources, he orally initiated a grievance with Schneck. Findings of Fact ¶ 18. A grievance meeting was held on June 9, 1993; Plaintiff, Plotnick, Schneck, Richard Smith, and Ulysses Sanchez, one of the Union's shop stewards, were present. Findings of Fact ¶ 21. Prior to the commencement of the meeting, Plotnick met briefly with Plaintiff. Plaintiff wanted to discuss an incident that occurred on line 10 the previous night, but Plotnick only was interested in hearing about what had happened on June 3. Findings of Fact ¶ 19. Plotnick also met with Anne White, who told him Plaintiff had "basically [sat] on [Lorine Conley's] lap" and refused to move to another position when directed to do so. White also told Plotnick that when Richard Smith arrived at the line, Plaintiff again insisted on performing the work she had done the previous night, and that when Richard Smith left the line, Plaintiff still did not move to the end of the line, where White had directed her to go. Findings of Fact ¶ 20.

Schneck commenced the grievance meeting by stating the grounds for Plaintiff's termination: refusing to move to a spot on the line designated by the line leader, making a scene on the line, using foul language, and sitting in one of the employee's laps. Findings of Fact ¶ 21. Plaintiff gave her account of the incident, insisting that she had not been insubordinate. *Id.* White also spoke at the meeting; her account paralleled the version she had related to Plotnick. Findings of Fact ¶ 22. Plotnick asked Plaintiff if she wished to call any witnesses. Plaintiff said that no one would speak on her behalf. Plotnick then asked Plaintiff who else was on the line at the time of the incident; Plaintiff named Lorine Conley, Veronica Angus, Jay Shaw, and Carmen Leon. Leon was called to the meeting and corroborated White's story. Findings of Fact ¶ 23.

Plotnick made an unsuccessful appeal to Schneck, pointing out Plaintiff's length of service with Del and the fact that it had been six months since the company last issued a warning to her. Findings of Fact ¶ 24. In rejecting Plotnick's appeal for leniency, Schneck reminded him that the last warning Plaintiff had received stated that, in light of her work history, Plaintiff would be terminated "on the spot" should she in the future display insubordination or create a disturbance on the work floor. *See* Findings of Fact ¶ 5 at 5; ¶ 18. Prior to leaving the plant, Plotnick asked Plaintiff for her telephone number. Findings of Fact ¶ 25. The Union held a meeting two days later, on June 11, 1993, and authorized Plotnick to speak with Schneck one last time to attempt to reduce Plaintiff's termination to a suspension. In the meeting with Schneck, held on June 16, 1993, Plotnick again cited Plaintiff's nine years with Del. Schneck refused to reinstate Plaintiff because of her disciplinary history with the company. Findings of Fact ¶ 26. At a meeting on June 18, 1993, the Union decided that, in light of her work history, as well as the fact that no one could corroborate her story, it would not take Plaintiff's case to arbitration. Findings of Fact ¶ 27.

Plaintiff maintains that the Union was arbitrary in its investigation of the events that culminated in her termination. She supports her assertion that the Union "did absolutely nothing in an effort to mount any defense on

plaintiff's behalf" with the following examples: (1) Larry Plotnick, the Union President who negotiated grievances on behalf of the Union, spent a mere five minutes with Plaintiff prior to the June 9, 1993, grievance meeting; (2) during Plotnick's meeting with Plaintiff, he was not interested in listening to what had transpired on the assembly line on June 2, 1993; according to Plaintiff, the events of June 2 suggested that her termination was a "set-up," orchestrated by unnamed persons; (3) Plotnick failed to question why, when Richard Smith was paged to line 10 by Anne White on June 3, 1993, he initially left the line without taking any action against Plaintiff; to Plaintiff, this "obviously" means that Richard Smith "was satisfied that plaintiff took another position on the line and the matter had been resolved"; and (4) Plotnick never explored "threatening" Del with arbitration on Plaintiff's behalf.

▮▮▮▮ Initially, the Court notes that, at best, the Union's failure to make the arguments Plaintiff suggests should have been made, or take the actions Plaintiff suggests should have been taken, are mere tactical errors on the part of the Union, which are insufficient to make out a claim for breach of the duty of fair representation. *See Barr v. United Parcel Serv.*, 868 F.2d 36, 43 (2d Cir.), *cert. denied*, 493 U.S. 975, 110 S.Ct. 499, 107 L.Ed.2d 502 (1989); *Caputo*, 730 F.Supp. at 1232 ("The union's failure to argue a plausible theory, articulated in hindsight by [the employee's] counsel is simply insufficient to establish the grounds for a breach of the duty of fair representation, given that at best such a failing would be attributable to negligence."); *see also Jensen v. Farrell Lines, Inc.*, 477 F.Supp. 335, 350 (S.D.N.Y.1979) ("At most the [union's] failure to raise certain arguments might be said to amount to negligence, but proof that a union acted negligently or exercised poor judgment is not enough to make out a claim of unfair representation."), *rev'd on other grounds*, 625 F.Supp. 379 (2d Cir.1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981). Union officials are not attorneys, and should not be held to a standard akin to legal malpractice. *See, e.g., Harris v. Schwerman Trucking Co.*, 668 F.2d 1204, 1206 (11th Cir. 1982) ("The grievance and arbitration process is not conducted in a judicial forum and union representatives are not held to strict standards of trial advocacy.").

In any event, the Court fails to see how the Union's investigation prejudiced Plaintiff. It is true that Union president Plotnick spent only a few minutes with Plaintiff prior to the commencement of the June 9, 1993, grievance meeting. Plaintiff's principal complaint in this regard, however, is that Plotnick refused to listen to her claim that she was "set up" because of events that transpired on line 10 on June 2, 1993. Nevertheless, no testimony was presented at trial as to what in fact happened on June 2; the Court was forced to consult Plaintiff's deposition transcript to obtain even a rudimentary understanding of how the events of that night may have impacted upon Del's decision to terminate Plaintiff. *See* Del Ex. 5; Findings of Fact ¶ 19 n. 8. Viewing those events in a light most favorable to Plaintiff reveals that Veronica Angus unjustifiably cursed at Plaintiff for allegedly failing to move out of Angus's way when Angus passed by with a tool under her arm. Richard Smith came to the line in response to Angus's scream and told Angus and/or Plaintiff to "cut it out."

▮▮▮▮ Plaintiff relies upon such sparse evidence to support her contention that, because Angus was on line 10 with Plaintiff the following night, a strong possibility exists that her termination was a "set-up." Such evidence, however, or bald allegations that certain employees may not have liked Plaintiff, hardly provide a basis to conclude that the employees on the line 10 overtime shift on June 3, 1993, including Anne White, the line leader, conspired to "set up" Plaintiff. Moreover, without more concrete evidence, a union's duty to represent fairly an employee does not require it to attack other union members in a desperate attempt to save the job of that employee.

Plaintiff's argument that Richard Smith initially left the assembly line without taking any action against Plaintiff because he was satisfied that the situation had been resolved similarly is unpersuasive, and indeed largely irrelevant. Richard Smith testified that he was of the mind to terminate Plaintiff as he

left the line, *see* Findings of Fact ¶ 14; despite his apparent authority to terminate Plaintiff on the spot, his decision to consult first with Del's director of human resources was not unreasonable. Moreover, even assuming that Smith "was satisfied that plaintiff took another position on the line," Pl.'s Post–Trial Mem. at 10, such did not extinguish Del's proffered reasons for terminating Plaintiff. Specifically, Plaintiff still had displayed insubordination by insisting on performing a particular task and refusing the line leader's direction to move to another position.

As to the Union's failure to "threaten arbitration," it is of course well-established that a disaffected employee has no absolute right to have her grievance taken to arbitration. *Vaca,* 386 U.S. at 191, 87 S.Ct. at 917; *Joseph v. Local UAW 1097 Union,* 917 F.Supp. 188, 193 (W.D.N.Y.1996) ("[T]he individual employee does not have an absolute right to have [her] grievance taken to the highest level regardless of the provisions of the applicable CBA."); *Weeks v. Local 1199, Drug, Hosp. and Health Care Employees Union,* 892 F.Supp. 568, 572 (S.D.N.Y.1995), *aff'd in relevant part,* No. 95–9045, 1996 WL 280136 (2d Cir.1996); *see also Ayala,* 74 F.3d at 345 (holding disgruntled employees have no absolute right "to have their union shepherd a complaint through the grievance process to the bitter end"); *Black v. Ryder/P.I.E. Nationwide, Inc.,* 15 F.3d 573, 585 (6th Cir.1994) ("A union does not . . . have to exhaust every possible remedy requested by a member facing disciplinary action."). Moreover, "[a]bsent a showing of arbitrary conduct or bad faith, a court should not second guess the union's decision not to pursue [the employee's] grievance to arbitration." *Lapir v. Maimonides Medical Ctr.,* 750 F.Supp. 1171, 1179 (E.D.N.Y.1990).

In the instant case, the Union made a rational and informed decision not to arbitrate Plaintiff's grievance. It first took into account Plaintiff's poor work history, including multiple warning notices and/or suspensions for insubordination, the ground upon which Plaintiff ultimately was terminated. *See, e.g., Camporeale v. Airborne Freight Corp.,* 732 F.Supp. 358, 369–70 (E.D.N.Y.) (holding union's duty of fair representation not breached for failure to arbitrate employee's termination for excessive absenteeism where, *inter alia,* employee had received "countless prior warnings"), *aff'd,* 923 F.2d 842 (2d Cir.1990); *Sargent v. Int'l Bhd. of Teamsters,* 713 F.Supp. 999, 1010 (E.D.Mich. 1989) (union's failure to arbitrate employee's termination did not violate duty of fair representation where decision was based in large part on employee's past disciplinary record); *Cunningham v. Owens–Illinois, Inc.,* 669 F.Supp. 757 (S.D.W.Va.1987) (finding no breach by union under circumstances similar to those in *Camporeale* ); *Haupt v. Michigan Bell Tel. Co.,* 599 F.Supp. 265, 269 (E.D.Mich.1984) (holding union made reasonable decision not to pursue employee's grievance to arbitration where employee was discharged for poor work performance and "had previously been progressively disciplined for poor work performance"); *cf. Weeks,* 892 F.Supp. at 573 ("[The union] was certainly justified in believing that arbitrating the propriety of [the employee's] termination was pointless" where [the employee] "had been suspended, put on notice for poor job performance and had falsified his employment application" in his short term of employment).

In addition, the Union noted that no one could corroborate Plaintiff's story in any respect. In point of fact, Plaintiff stated at the June 9, 1993, grievance hearing that no one would speak on her behalf. Faced with these prospects, the Union decided to allow Plotnick to make a humanitarian appeal to Del's director of human resources on the basis of Plaintiff's longevity with the company, rather than spend time and money unsuccessfully arbitrating the matter. Evidence adduced at trial showed that such an appeal by Plotnick to Charles Schneck in January 1993, when the company wished to terminate Plaintiff, was successful. *See* Findings of Fact ¶ 5 at 4. The Union's determination that Plaintiff's grievance lacked merit was based upon objective criteria and fell well-within the "wide range of reasonableness" standard accorded its actions. Moreover, the foregoing consid-

erations also lead the Court to conclude that the Union rationally decided not to "threaten" Del with arbitration.[13]

Finally, the Court finds Plaintiff's analogizing of this case with *Mayes v. Drug, Chemical, Cosmetics, Plastics and Affiliated Indus. Warehouse Employees Local 815*, CV 93–5730 (ARL) (E.D.N.Y. May 26, 1995), to be incongruous; that case and the one at bar were based upon entirely different factual scenarios warranting different legal conclusions. For example, in *Mayes*, Magistrate Judge Lindsay observed that "had [the Union] done any investigation, it could have mounted a viable defense of Mayes." Pl.'s Post–Trial Mem. at 13 (quoting Findings of Fact and Conclusions of Law, dated May 26, 1995, Lindsay, M.J.). In the instant case, however, Plaintiff failed to state how further investigation by the Union would similarly have resulted in a "viable defense." As stated previously, the alleged deficiencies in the Union's investigation at best amount to tactical errors which did not affect the merits of Plaintiff's grievance.

 In sum, the Court finds that the Union acted within its discretion in refusing to arbitrate Plaintiff's termination, or otherwise "threaten" Del with arbitration. *See also Wozniak v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America*, 842 F.2d 633, 636 (2d Cir.1988) ("There is no arbitrariness in failing to process a bad case.").

## CONCLUSION

For the reasons set forth above, the Court holds that Plaintiff has failed to demonstrate by a fair preponderance of the credible evidence that the Union breached its duty of fair representation with respect to her termination. Having so held, the Court need not address whether Del in fact violated any of the provisions of its collective bargaining agreement with the Union.

Accordingly, the Clerk of the Court is directed to enter judgment in favor of Defendants.

**IT IS SO ORDERED.**

13. The situation would perhaps be different if the Union routinely made such threats when processing an employee's grievance. No evidence was presented, however, suggesting that such was the case. During cross examination of Larry Plotnick, the following colloquy took place:

MR. DUBINSKY: Now you also testified that sometimes you would threaten [Del director of human resources] Schneck with arbitration. MR. PLOTNICK: I think threaten is a poor choice. I may have said "threaten" but we don't threaten. In *rare* occasions we will send a letter to companies, not necessarily to Mr. Schneck, put [sic] to various companies, saying we will proceed to arbitration. And sometimes companies will relent on the discharging and change it to a suspension.

Tr. 275 (1/25/96) (testimony of Larry Plotnick) (emphasis added). The Court would add as a common-sense observation that the *Union's* effectiveness as collective bargaining representative of Del's employees assuredly would be undermined if it engaged in such a tactic of "crying wolf" no matter how baseless a grievance appeared to be.